**MERRILL LYNCH, PIERCE, FENNER & SMITH INC., Plaintiff,**

v.

**Gary L. RAN, Andrew M. Israel, Robert A. Stone, and Lyle M. Wolberg, Defendants.**

**No. 99–CV–60555–AA.**

United States District Court, E.D. Michigan, Southern Division.

Sept. 30, 1999.

---

Stephen K. Postema, Bodman, Longley, Ann Arbor, MI, Joseph A. Dougherty, Rubin & Associates, P.C., (argued), Paoli, PA, for Merrill Lynch.

S. Thomas Weinner, Seth Gould, Bloomfield Hills, MI, for Ran, defendant.

Gary M. Saretsky, Bloomfield Hills, MI, for proposed intervenor.

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

STEEH, District Judge.

This action arises out of the conduct of four stockbrokers who jointly resigned from Merrill Lynch on the Friday of Labor Day Weekend to join one of the firm's competitors, Paine Webber. Defendants spent the holiday weekend using confidential client information, which they absconded with, to carry out an orchestrated and pre-planned solicitation of more than 2,800 former clients they serviced while at Merrill Lynch in violation of their employment agreements. On the first business day after defendants joined Paine Webber, Tuesday, September 7, 1999, the court granted Merrill Lynch's motion for a temporary restraining order (TRO). The TRO enjoined defendants from further solicitation of their former clients, from accepting the business of any client improperly solicited, and ordered defendants to return confidential client information wrongfully converted.

Now before the court is Merrill Lynch's motion for a preliminary injunction. On Tuesday, September 21, 1999, the court heard oral argument on the motion. In addition to the careful consideration given to counsels' oral presentations, which were well-argued by both sides, the court also has duly considered the voluminous and well-drafted briefs submitted by counsel on the matter. In reaching its decision, the court was impressed with the quality and persuasiveness of the arguments made by both sides. Ultimately, however, the four defendants are bound by the terms of the written employment agreements which they willingly executed. Equity requires holding defendants to their contractual promises as they are all sophisticated and highly educated individuals whose own aptitudes are borne out by the multi-million dollar annual compensation that they received both at their predecessor, Merrill Lynch, and with their current employer, Paine Webber. Minor differences between the agreements put aside, those contracts clearly barred defendants from soliciting former Merrill Lynch clients for a period of one year after leaving the firm, and from confiscating confidential client information. Having willfully breached those promises in clear violation of their employment agreements, Merrill Lynch is entitled to injunctive relief to prevent defendants from reaping the benefits of their misconduct, to enforce the express terms of those agreements, three of which specifically require that the remedy for a breach is injunctive relief, and to maintain the status quo until this matter can proceed to arbitration before the National Association of Securities Dealers (NASD).

## I. BACKGROUND

### A. Defendants' Resignations

On September 3, 1999, the Friday of Labor Day weekend, four Merrill Lynch stockbrokers working at the Farmington Hills branch office: Andrew Israel, Gary Ran, Robert Stone, and Lyle Wolberg, submitted their letters of resignation announcing their plans to begin working for Paine Webber in Farmington Hills. The brokers began working for Merrill Lynch as follows: Ran—June, 1983, Israel—July, 1997, Stone—March, 1987, Wolberg—April, 1994. Prior to their joint resignations, defendants worked as a group at Merrill Lynch, together managing over 2,800 Merrill Lynch accounts worth over $1.3 billion in assets. Combined, defendants earned over $7.4 million commission revenues in 1999 alone. While at Merrill Lynch, the four stockbrokers pooled their accounts and split commissions as follows: Wolberg—10%, Stone—15%, Israel—18%,

Ran—57%. The four controlled the largest book of business at Merrill Lynch's Farmington Hills office. According to the complaint, defendants were offered over $6 million in up-front cash bonuses to join Paine Webber.

All of the brokers, with the exception of Stone, had worked as brokers before their employment with Merrill Lynch. Stone is Ran's brother-in-law and Ran convinced him to join Merrill Lynch in 1987. Ran has worked for Merrill Lynch since 1983 when he left a small securities firm in Birmingham, Michigan known as Ashton & Company to join the firm. He estimates that about 5% of his account base is derived from his early employment with Ashton. Ran inherited the bulk of his business from two Merrill Lynch brokers, Dave Caplan and Ed Broida, who retired and died respectively in approximately 1997. Prior to inheriting their book of business, Ran entered into agreements with Caplan and Broida, which were approved by Merrill Lynch management, whereby they agreed to pool their client-bases and Ran promised to earn $1 million in production credits annually. Ran claims that he was responsible for Merrill Lynch's decision to hire Stone and Wolberg, and that these two younger brokers were paid compensation solely from his share of commissions generated from the book of business he serviced. Wolberg left Prudential in 1994 to join Merrill Lynch, taking with him most of his Prudential clients. He estimates, that when he resigned, about 5% of his client base at Merrill Lynch consisted of clients derived from his employment with Prudential. Similarly, Israel left Morgan Stanley in 1997 taking with him the majority of his clients. He estimates, that when he resigned, about 90% of his client base at Merrill Lynch consisted of clients derived from his employment at Morgan Stanley.

## B. Defendants' Restrictive Covenants

All of the defendants signed non-use, non-disclosure and non-solicitation restrictions which prevent them from soliciting any of the clients of Merrill Lynch whom they served or whose names became known to them while they were at Merrill Lynch for a period of one year after leaving the firm and from confiscating client information. Specifically, Ran signed an Account Executive Agreement, Israel and Wolberg signed a Financial Consultant Employment Agreement and Restrictive Covenants, and Stone signed an Account Executive Trainee Agreement. (Complaint, Ex. A–D). Ran's agreement contained the following non-use, non-disclosure and non-solicitation restrictions:

1. All records of Merrill Lynch, including the names and addresses of its clients, are and shall remain the property of Merrill Lynch at all times during my employment with Merrill Lynch and after termination for any reason of my employment with Merrill Lynch, and that none of such records nor any part of them is to be removed from the premises of Merrill Lynch either in original form or in duplicated or copied form, and that the names, addresses, and other facts in such records are not to be transmitted verbally except in the ordinary course of conducting business for Merrill Lynch.

 In the event of termination of my services with Merrill Lynch for any reason, I will not solicit any of the clients of Merrill Lynch whom I served or whose names became known to me while in the employ of Merrill Lynch in any community or city served by the office of Merrill Lynch, or any subsidiary thereof, at which I was employed at any time for a period of one year from the date of termination of my employment. In the event that any of the provisions contained in this paragraph and/or paragraph (1) above are violated I understand that I will be liable to Merrill Lynch for any damage caused thereby.

(Complaint, Ex. A at ¶¶ 1–2). Similarly, the contracts signed by Wolberg and Israel contain the following non-use, non-disclosure and non-solicitation agreements:

1. *All records*, whether original, duplicated, computerized, memorized, handwritten, or in any other form, *and all information* contained therein, including names, addresses, phone numbers, and financial information of any account, customer, client, customer lead or prospect ("Account"), are confidential and are the sole and exclusive property of Merrill Lynch. This information, whether provided to me by Merrill Lynch or by any Account, is entrusted to me as an employee and sale representative of Merrill Lynch. I will not use this information or remove any such records from the Merrill Lynch office except for the sole purpose of conducting business on behalf of Merrill Lynch. I agree not to divulge or disclose this information to any third party and under no circumstances will I reveal or permit this information to become known by any competitor of Merrill Lynch either during my employment or at any time thereafter.

This information is extremely valuable to Merrill Lynch and Merrill Lynch takes all reasonable measures to maintain its confidentiality and to guard its secrecy. This information is not generally known outside Merrill Lynch and within Merrill Lynch this information is confidential and used only a "need to know" basis. This information is developed and acquired by great expenditures of time, effort, and money. This information is unique and cannot be lawfully duplicated or easily acquired. Consequently, I agree that these records and the information contained therein are the property of Merrill Lynch and are deserving of trade secret status and protection.

2. If, at any time, I resign from Merrill Lynch, provoke my termination, or am terminated for cause, I agree that for a period of one year following my termination I will not solicit by mail, by phone, by personal meeting, or by any other means, either directly or indirectly, any Account whom I served or whose name became known to me during my employment at Merrill Lynch in any office and in any capacity. My agreement "not to solicit" means that I will not, during my employment and for a period of one year thereafter, initiate any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting any Account:

(a) to transfer from Merrill Lynch to me or to my new employer, or

(b) to open a new account with me or with my new employer, or

(c) to otherwise discontinue its patronage and business relationship with Merrill Lynch.

(Complaint, Ex. B & D, ¶¶ 1–2) (emphasis in original). Similarly, Stone's employment contract contained non-use, non-disclosure and non-solicitation restrictive covenants:

1. All records of Merrill Lynch, including the names and addresses of its clients and prospective clients are and shall remain the property of Merrill Lynch at all times during my employment with Merrill Lynch and after termination of my employment for any reason with Merrill Lynch. None of such records, nor any part of them is to be removed by me from the premises of Merrill Lynch either in original form or in computerized, duplicated, or copied form except with the permission of an office manager for the purpose of conducting the business of Merrill Lynch and the names, addresses,

and other facts in such records are not to be transmitted verbally, in writing, or in computerized form by me except in the ordinary course of conducting business for Merrill Lynch. All of said records or any part of them are the sole proprietary information of Merrill Lynch and shall be treated by me as confidential information of Merrill Lynch.

2. In the event of termination of my services with Merrill Lynch for any reason, I will (i) not solicit, for a period of one year from the date of termination of my employment, any of the clients or prospective clients of Merrill Lynch whom I served or whose names became known to me while in the employ of Merrill Lynch in any office of Merrill Lynch in which I was employed, and who reside within one hundred-miles of the Merrill Lynch office or offices in which I was employed, and (ii) *return any original records and purge or destroy any computerized, duplicated, or copied records referred to in paragraph 1 which have been removed from the premises of Merrill Lynch in any form.*

(Complaint, Ex. C at ¶¶ 1–2) (emphasis in original).

Israel, Wolberg and Stone also expressly agreed to the issuance of injunctive relief by the court in the event they breached any of their restrictive covenants. The contracts of Israel and Wolberg both contain the identical provision agreeing to injunctive relief in the case of a breach:

4. In the event I breach any of the covenants of paragraphs 1, 2 or 3, I agree that Merrill Lynch will be entitled to injunctive relief. I recognize that Merrill Lynch will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Merrill Lynch or to protect and preserve the status quo. Therefore, I CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER or A PRELIMINARY or PERMANENT INJUNCTION ordering:

(a) that I immediately return to Merrill Lynch all records whether original, duplicated, computerized, handwritten, or in any other form whatsoever, and that I be enjoined and restrained from using or disclosing any information contained in such records; and

(b) that, for a period of one year, I be enjoined and restrained from soliciting any Account whom I served or whose name became known to me while employed by Merrill Lynch, in any office and in any capacity; and

(c) that I be further enjoined and restrained, for a period of one year, from accepting business from any Account who was solicited in violation of paragraph 2 or whose records and information was used in violation of paragraph 1.

5. For the purposes of paragraph 4, I agree to submit to, and confer exclusive jurisdiction on, the United States District Court or the State Court which has original jurisdiction for judicial district or county in which I last worked for Merrill Lynch. This Agreement shall be construed, governed by, and enforced in accordance with the laws of said jurisdiction.

(Complaint, Ex. B & D, ¶¶ 4–5) (emphasis in original). Similarly, Stone agreed to injunctive relief in the case of a breach:

4. *I further consent to the issuance of a temporary restraining order or a preliminary injunction to prohibit the breach of any provision of this contract, or to maintain the status quo pending the outcome of any arbitration proceedings which may be initiated.*

(Complaint, Ex. C at ¶ 4) (emphasis in original).

## C. Defendants' Defenses

Defendants argue that they should not be bound by these agreements because (1) they are unreasonable; (2) Merrill Lynch has unclean hands because it engages in the same conduct, and in fact, aggressively solicited Israel's clients when he left Morgan Stanley and Wolberg's clients when he left Prudential, in violation of their agreements with those competing firms, and (3) Merrill Lynch precipitated the brokers' resignations, thus deeming the restrictive covenants unenforceable, by (a) refusing to offer defendants the office support requested and needed; (b) by compromising its promise of confidentiality to Israel when he was undergoing participation in the Employee Assistance Program (EAP) for temper management by disclosing the fact that he was on probation in an e-mail circulated branch-wide, and (c) by changing its method of compensating brokers in June, 1999, by invoking a flat-fee rate of one percent for certain high-end clientele and an on-line trading fee of $29.95 which, although clearly beneficial to clients, might reduce the brokers' yearly compensation by as much as 20%.

In addition to these arguments, defendants argue that Ran's non-disclosure, non-competition and non-solicitation agreement is unenforceable because he signed his employment contract in 1983 at a time when Michigan prohibited the enforcement of non-compete clauses in employment contracts pursuant to M.C.L. § 445.761 which was repealed on March 29, 1986. The employment contracts of the other defendants are governed by M.C.L. § 445.774a which provides that restrictive covenants not to compete are enforceable as long as they are reasonable in duration, geographic area and type of employment or line of business.

## D. Defendants' Uncontested Breach of the Restrictive Covenants

It is not disputed that defendants solicited all of their clients in an *en masse* mailing sent out by overnight mail on the day they tendered their resignations. At the preliminary injunction hearing, Merrill Lynch stated that through discovery, including the depositions of the four named defendants and the branch manager of Paine Webber's Farmington Hills office, it learned that defendants orchestrated their move to Paine Webber for months before actually resigning. During that time, the defendants, who were well aware of their contractual obligations, and were receiving legal counsel from Paine Webber's attorneys, plotted their departure and prepared for the solicitation which occurred in this case and which now forms the basis for the injunctive relief sought. Prior to leaving Merrill Lynch, defendants printed out client names, phone numbers and other confidential information and provided this information to Paine Webber in direct contravention of their employment agreements. Paine Webber then had a third-party prepare the mass mailing which was sent, within one hour of defendants' resignations, to over 2,800 persons holding accounts with Merrill Lynch. This mailing included account transfer forms specifically tailored to each client's specific portfolio, as well as the client's social security number, home phone number, and Merrill Lynch account number, details which plaintiff claims demonstrate that defendants absconded with confidential proprietary information which defendants had promised not to remove from the Merrill Lynch premises. It is also undisputed that during the three-day holiday weekend preceding the entry of the TRO, defendants solicited many of their former clients by telephone and in personal meetings. As of the date oral argument was heard, 500 former clients had returned account transfer forms to Paine Webber based on the wrongful solicitations.

In their papers filed with the court, defendants allege that they should be excused from their non-use and non-disclosure agreements because Merrill Lynch failed to preserve client confidentiality by allowing brokers to bring client informa-

tion home, by allowing papers to be tossed into the garbage without shredding, and other similar allegedly sloppy business practices. Defendants' argument lacks merit. Defendants' employment agreements specifically allowed them to remove customer records for the purpose of conducting Merrill Lynch business. Even in the absence of such explicit contractual language, clearly allowing brokers some flexibility in using confidential client information outside the confines of Merrill Lynch's offices to conduct Merrill Lynch business is simply good business practice in today's modern world where work is routinely done from the home office, car, or wherever the broker and his cell phone might be. To the extent defendants maintain Merrill Lynch waived trade secret protection through occasional lapses in security, the argument is not well-documented nor have defendants cited any legal authority supporting this defense.

■ Similarly, the court must reject the brokers' argument that the proprietary information protected by the restrictive covenants at issue here is the property of the clients alone and does not belong to Merrill Lynch. The goodwill of Merrill Lynch, which is solely a service industry, is measured almost entirely by its client base. Maintaining the confidentiality of customers' private financial affairs is paramount to the reputation and continued business success of the firm. When defendants agreed to work for Merrill Lynch, they signed agreements recognizing the importance of client confidentiality to the firm and expressly agreeing that the information belonged to the firm. For example, Israel and Wolberg agreed that all customer records "and all information contained therein, including names, addresses, phone numbers, and financial information of any account, customer, client, customer lead or prospect ("Account"), are confidential and are the sole and exclusive property of Merrill Lynch." (Complaint, Ex. B & D at ¶¶ 1–2). Similarly, Ran agreed that "[a]ll records of Merrill Lynch, including the names and addresses of its clients, are and shall remain the property of Merrill Lynch." (Complaint, Ex. A at ¶ 1). Stone also agreed that "[a]ll records of Merrill Lynch, including the names and addresses of its clients are and shall remain the property of Merrill Lynch at all times during my employment with Merrill Lynch and after termination of my employment for any reasons with Merrill Lynch." (Complaint, Ex. C at ¶ 1). Given that the four defendants expressly agreed that client information belonged to Merrill Lynch, their post-breach arguments to the contrary are unavailing.

### E. The Complaint

Plaintiff filed a complaint on the basis of diversity jurisdiction alleging (1) breach of contract, (2) tort-conversion in violation of Michigan's Uniform Trade Secrets Act, (3) breach of fiduciary duty, and (4) unfair competition.

### F. The TRO

On September 7, 1999, the court heard oral argument from both sides on plaintiff's request for a TRO and granted the relief sought. On September 13, 1999, the parties agreed to modify the TRO to state that discovery would commence for both sides (the original merely stated for Merrill Lynch), and to clarify that only defendant Stone, and none of the other defendants (as the original TRO implied), could accept account transfers from Merrill Lynch customers living more than 100 miles from Merrill Lynch's Farmington Hills office. This distinction is based on specific contractual language in Stone's contract alone.

### II. STANDARD FOR PRELIMINARY INJUNCTION

■ The decision of whether or not to issue a preliminary injunction lies within the sound discretion of the district court. *Golden v. Kelsey–Hayes,* 73 F.3d 648, 653 (6th Cir.1996), *cert. denied,* 519 U.S. 807, 117 S.Ct. 49, 136 L.Ed.2d 13 (1996). In

determining whether to grant or deny an injunction, the district court is required to consider four factors:

1. whether the movant is likely to prevail on the merits;
2. whether the movant would suffer an irreparable injury if the court does not grant a preliminary injunction;
3. whether a preliminary injunction would cause substantial harm to others; and
4. whether a preliminary injunction would be in the public interest.

*Id.* "None of these factors, standing alone, is a prerequisite to relief; rather, the court should balance them." *Id.* (citations omitted). A district court is required to make specific findings concerning each of the four factors unless fewer are dispositive of the issue. *Performance Unlimited v. Questar Publishers, Inc.,* 52 F.3d 1373, 1381 (6th Cir.1995) (citations omitted).

### III. ANALYSIS

#### A. *Likelihood of Success on the Merits*

##### 1. Whether Restrictive Covenants are Enforceable

##### a. Contracts of Israel, Wolberg and Stone

Three of the four defendants, Israel, Wolberg and Stone, signed the employment contracts in dispute after Michigan enacted legislation allowing the enforcement of non-compete agreements so long as the agreements are reasonable.

1. M.C.L. § 445.774a provides:

> (1) An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was

M.C.L. § 445.774a.[1] As to these three defendants, plaintiff has clearly shown that defendants signed valid non-use, non-disclosure, and non-solicitation agreements which are enforceable under Michigan law. The contracts at issue apply a one year bar preventing defendants from soliciting Merrill Lynch clients who became known to them during their employment and from confiscating Merrill Lynch's customer records. Similar employment agreements have been routinely enforced. *See* Exhibits A–L of plaintiff's brief attaching 11 injunctions entered against former Merrill Lynch stockbrokers in the Eastern and Western Districts of Michigan (all but one unpublished); *see also Robert Half Int'l, Inc. v. Van Steenis,* 784 F.Supp. 1263 (E.D.Mich.1991). Moreover, Merrill Lynch has shown, and defendants have not disputed, that they violated their agreements by actively soliciting clients and confiscating proprietary customer information.

#### b. Ran's Contract

Only defendant Ran signed his employment contract at a time when Michigan law expressly prohibited the enforcement of non-compete agreements as a matter of public policy pursuant to M.C.L. § 445.761.[2] Merrill Lynch argues that the restrictive covenants in his employment contract are more fairly characterized as non-use, non-disclosure and non-solicitation promises which were enforceable at the time the contract was entered. In

made and specifically enforce the agreement as limited.
(2) This section shall apply to covenants and agreements which are entered into after March 29, 1985.

2. Section 445.761 provides:

> All agreements and contracts by which any person, co-partnership or corporation promises or agrees not to engage in any avocation, employment, pursuit, trade, profession or business, whether reasonable or unreasonable, partial or general, limited or unlimited, are hereby declared to be against public policy and illegal and void.

support of this argument, Merrill Lynch relies on *Rehmann, Robson & Co. v. McMahan,* 187 Mich.App. 36, 466 N.W.2d 325 (1991) where the Michigan Court of Appeals upheld a restrictive covenant entered at a time when § 445.761 applied. In that case, an accountant agreed not to contact, solicit or perform services for a client of the partnership for a period of two-years after leaving. The court found that this provision was a reasonable anti-piracy clause, not a covenant not to compete. *Id.* at 47, 466 N.W.2d at 330. Ran, on the other hand, contends that the clause he agreed to amounts to an unenforceable non-compete provision. Ran relies primarily on *E.W. Smith Agency, Inc. v. Sanger,* 350 Mich. 75, 85 N.W.2d 84 (1957). *Sanger* involved a non-compete agreement whereby an insurance underwriter agreed not to engage in the same or similar line of business in Wayne County for a period of three years after leaving the employ of the plaintiff, which the Michigan Supreme Court ruled was an unenforceable promise under Michigan law pursuant to § 445.761. *Id.* at 81, 85 N.W.2d at 87.

■ The contractual language in this case is akin to that at issue in *Rehmann, Robson & Co.* and is distinguishable from the provision in dispute in *Sanger.* In this case, Ran agreed:

> In the event of termination of my services with Merrill Lynch for any reason, I will not solicit any of the clients of Merrill Lynch whom I served or whose names became known to me while in the employ of Merrill Lynch in any community or city served by the office of Merrill Lynch, or any subsidiary thereof, at which I was employed at any time for a period of one year from the date of termination of my employment.

(Complaint, Ex. A at ¶ 2). Based on the contractual language quoted above, Ran's agreement not to solicit Merrill Lynch clients was not an illegal agreement not to compete, as it in no way precluded him from pursuing his vocation, but rather was a reasonable and enforceable anti-piracy

provision. Defendants' reliance on other cases finding non-compete clauses unenforceable under § 445.761, *see Monsanto Co. v. Manning,* No. 87–1790, 841 F.2d 1126 (6th Cir. Mar.8, 1988) (unpublished opinion, table format only), is misplaced as the restrictive covenant at issue here is not a promise not to compete, but rather a promise not to use or disclose confidential client information and not to solicit former clients for a period of one year.

Similarly, Ran's reliance on Judge Feiken's opinion in *Muma v. Financial Guardian, Inc.,* 551 F.Supp. 119 (E.D.Mich.1982) is not availing. The facts of *Muma* are distinguishable from those presented here. In that case, an insurance company removed its president and paid him a severance package. *Id.* at 121. The former president then sued for a declaratory judgment that he was not bound by the terms of a covenant he signed that provided that for a period of five years, or until he divested himself of all his stocks in the company, whichever came later, the president would not "knowingly directly or indirectly, solicit or interfere with, any business or insurance account of [the insurance company], influence or attempt to influence any person, firm, corporation or other entity to stop or change their employment or business relationship with [the insurance company], or disclose any confidential records or information of [the insurance company]." *Id.* Despite defendants' arguments here that their contracts are analogous to the contract at issue in *Muma,* the court cannot agree. In that case, the non-solicitation agreement was to last at least five years, and possibly indefinitely, as the covenant continued until the former president divested himself of all stock holdings and at the time of the lawsuit, he still held the largest single block of stock shares. *Id.* at 121 n. 3. By contrast, the restrictive covenants not to solicit in this case are much narrower, lasting for a period of only one year, and thus, cannot be said to approximate the onerous covenant not to compete which was invalid under the now

repealed § 445.761. Even if the court were not to so distinguish this action from *Muma*, the court reads § 445.761 according to its plain meaning which requires the invalidation only of covenants not to compete, not of covenants not to solicit which are at issue here.

In light of overwhelming case authority supporting the enforceability of the restrictive covenants in controversy here, and the undisputed fact that defendants confiscated client information and solicited former clients, Merrill Lynch has met its burden of showing that it has a substantial likelihood of prevailing on the merits as to at least its breach of contract claim pled in Count I. This is especially true as to the three defendants signing contracts after the enactment of M.C.L. § 445.774a as that statute specifically provides that restrictive covenants in employment agreements are enforceable by injunction.

■ Moreover, even if Ran's restrictive covenants are unenforceable, Merrill Lynch is entitled to trade secret protection under Michigan's Uniform Trade Secrets Act, M.C.L. § 445.1901 *et seq.*, which plaintiff pled in Count II. Under the Act, trade secrets are defined as:

(d) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:

(i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

§ 445.1902(d). Michigan courts have found that trade secrets are entitled to protection under the Act in similar circumstances. *See Hayes–Albion v. Kuberski*, 108 Mich.App. 642, 651, 311 N.W.2d 122, 126 (1981) (customer list constitutes trade secret), *aff'd in part*, 421 Mich. 170, 364 N.W.2d 609 (1984). Similarly, federal courts have held that Merrill Lynch's customer list is entitled to trade secret status and that confiscation of such a trade secret entities Merrill Lynch to injunctive relief against the wrongdoer. *See e.g. Merrill Lynch v. Hagerty*, 808 F.Supp. 1555, 1557 (S.D.Fla.1992), *aff'd*, No. 92–5153, 2 F.3d 405 (11th Cir. Aug.16, 1993) (table format only); *Ruscitto v. Merrill Lynch*, 777 F.Supp. 1349 (N.D.Tex.), *aff'd*, No. 91–1869, 948 F.2d 1286 (5th Cir. Nov.12, 1991) (table format only), *cert. denied*, 504 U.S. 930, 112 S.Ct. 1994, 118 L.Ed.2d 590 (1992). The Michigan Uniform Trade Secrets Act also specifically provides for injunctive relief to remedy threatened or actual misappropriation. *See* M.C.L. § 445.1903.

■ Defendants argue that the agreements are not enforceable because Israel, Ran and Wolberg brought many of their own clients with them to Merrill Lynch; thus, Merrill Lynch lacks a reasonable competitive business interest in those clients. Defendants' argument lacks merit. Most importantly, the court notes that the contracts at issue here provide that Merrill Lynch has a significant proprietary interest in client information which is to be treated as the exclusive property of Merrill Lynch. No provision in the contracts treats clients developed after a broker begins employment with Merrill Lynch differently than those a broker brings with him to the firm. Defendants were compensated by Merrill Lynch for all of the clients they serviced, including those clients the broker already had a relationship with before joining the firm. The fact that some of these defendants had longstanding client relationships which they continued upon joining Merrill Lynch appears to be the very reason that some of the defendants, especially defendant Israel, were recruited by the firm in the first place. Given the reality that the securities brokerage industry is a highly competitive market in which firms vigorously compete

for successful brokers, primarily because of the clients they will bring with them or can be expected to develop at a firm, defendants' argument that their pre-existing clients do not belong to Merrill Lynch is simply wishful thinking. Had defendants wished to maintain information regarding their pre-existing clients as their own personal property, defendants should have negotiated for this right when they began employment with Merrill Lynch or gone into business for themselves. Defendants did neither, and thus their arguments now that Merrill Lynch did not have a legitimate business interest in those accounts is simply specious.

■ Defendants further argue that Merrill Lynch has unclean hands because it participates in the same industry practice of recruiting brokers from other securities firms and soliciting their former clients. Merrill Lynch responds that Paine Webber also sues for injunctive relief when other securities firms raid their brokers. Based on the representations of both parties and on the volume of similar cases making their way into the federal courts, it appears that the large securities firms are all engaging in similar dichotomous conduct, allegedly the industry practice, of both recruiting successful brokers away from other firms and of racing to the courthouse to enforce contracts when their own brokers are enticed not only to leave but to willfully breach their contracts. Although this unfortunate conduct appears to be quite rampant in the industry as a whole and is undeniably placing a certain, most likely avoidable burden on the federal courts, Merrill Lynch's decision to encourage brokers from other firms to join them and to engage in conduct which violates those brokers' employment contracts with competing firms, even if true, is irrelevant to the instant dispute. Such an offensive industry practice is not grounds for refusing to enforce the valid restrictive covenants at issue here, however distasteful the court finds the untoward business practices of the brokerage firms.

## 2. Whether Merrill Lynch Breached the Contracts First

■ Defendants have argued that they should be excused from their contractual obligations because Merrill Lynch breached the contracts first by (1) unilaterally cutting their compensation in contravention of their alleged employment agreements, and (2) breaching the confidentiality requirements of the EAP with respect to defendant Israel. To the extent the court can address these defenses now, defendants' arguments are not supported by the existing law or the facts and circumstances of this case. Defendants are correct that in Michigan, the common law requires that a "substantial breach" of a contract by one party excuses the other from compliance as well. In *Baith v. Knapp–Stiles, Inc.*, the Michigan Supreme Court restated the well-established rule that " '[h]e who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform.' " 380 Mich. 119, 126, 156 N.W.2d 575, 578 (1968) (citing *Jones v. Berkey* 181 Mich. 472, 148 N.W. 375 (1914) and *Ehlinger v. Bodi Lake Lumber Company* 324 Mich. 77, 36 N.W.2d 311 (1949)). "Substantial breach" means a breach which "has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other party." *Id.* (citations omitted). Despite this general rule, defendants have failed to show that the terms of their employment agreements guaranteed them a certain commission rate or confidentiality under the EAP program. Unlike the cases from other jurisdictions which defendants rely upon, defendants have failed to point out any express written contractual language promising them certain commission rates or EAP confidentiality. *Cf. Alexander & Alexander, Inc. v. Feldman,* 913 F.Supp. 1495 (D.Kan.1996) (refusing to

enforce non-compete agreement where employer unilaterally breached express written promise to pay certain commission). Moreover, they have failed to allege any oral promises to the same effect.

Instead, defendants appear to base their argument that they should continue to receive the same level of commissions which they had in the past on the same type of "legitimate expectation" analysis which the Michigan Supreme Court applied in *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 598, 292 N.W.2d 880 (1980), although they do not reference that seminal opinion by name. In *Toussaint*, the court recognized the existence of a just-cause employment contract, even in the absence of an express written contract. *Id.* at 598, 292 N.W.2d at 884. The fatal fallacy with defendants' argument here, however, is that the Michigan Supreme Court has expressly limited *Toussaint* to the question of whether a just-cause employment contract exists and has refused to extend the decision to construe management policies governing compensation as contractual terms. *See Dumas v. Auto Club Ins. Ass'n*, 437 Mich. 521, 532, 473 N.W.2d 652, 657 (1991). In *Dumas*, the court explained that "[g]iven the traditional reluctance of courts to interfere with management decisions and the needed flexibility of businesses to change their policies to respond to changing economic circumstances, we conclude that *Toussaint* should not be extended to create legitimate expectations of a permanent compensation plan. Previous cases have not extended the legitimate-expectations theory to facts similar to these, and we decline the opportunity to extend the theory to compensation terms." *Id.*

In *Dumas*, insurance sales agents who had been paid a certain rate of commission, some of whom had been promised orally that the rate would continue "forever," sued for breach of contract when the employer unilaterally altered its compensation scheme across the board in response to changing marketing conditions. *Id.* at 527, 473 N.W.2d at 654. The Michigan Supreme Court ruled that none of the employees, even those promised orally that the compensation scheme would continue "forever," could sue for breach of contract because the compensation scheme did not amount to a contractual promise, but rather a management policy. *Id.* at 532–46, 473 N.W.2d at 652–63. In addition, the court found that the alleged oral promises were barred by the statute-of-frauds. *Id.* at 539, 473 N.W.2d at 660. In reaching this decision, the court stressed that an employer's ability to change its system of compensation must be clearly contracted away before a court will impede on the employer's fundamental managerial powers and prerogatives. *Id.* at 542, 473 N.W.2d at 661. In this case, defendants have failed to show that Merrill Lynch promised defendants a certain percentage of commissions; thus, defendants have failed to show that Merrill Lynch "substantially breached" their at-will employment agreements. To the extent that defendants can argue that employment manuals guaranteed Israel confidentiality with respect to his participation in the EAP program, confidentiality which admittedly was unwittingly sacrificed, inclusion of such a policy in an employment manual has never been held to give rise to a contractual right. As discussed above, the Michigan Supreme Court has limited the type of contractual right which may be inferred under *Toussaint* to promises of just-cause employment only.

The cases from other jurisdictions which defendants rely upon also are inapposite. *See, e.g. Bradley v. Health Coalition, Inc.*, 687 So.2d 329 (Fla.Dist.Ct.App.1997) (reversing TRO enforcing non-compete agreement where trial court refused to allow defendant to present evidence that employer breached contract first by refusing to pay compensation owed and forcing employee to sell unfit products and asking him to alter invoices to defraud customers); *Custom Drapery Co., Inc. v. Hardwick*, 531 S.W.2d 160 (Tex.Civ.App.1975)

(refusing to enforce non-compete agreement on grounds clause was unreasonable and employer had unclean hands due to reduction in defendant's compensation); *SCM Corp. v. Triplett Co.*, 399 S.W.2d 583 (Tex.Civ.App.1966) (denying injunctive relief to enforce non-compete agreement where employer changed compensation in violation of contract and employer delayed over two months in seeking injunctive relief).

■ Moreover, defendants have failed to show that Merrill Lynch had unclean hands in adopting a new compensation system which applied across the board and was designed to respond to the demands of our fluctuating economy. The situation presented here is unlike the case of *L.G. Balfour Co., Inc. v. McGinnis*, 759 F.Supp. 840 (D.D.C.1991), which defendants rely upon in their response brief. In that case, the plaintiff-employer was precluded from enforcing a non-compete agreement, as opposed to a non-solicitation provision, where the employer was responsible for delivery problems and the employer's changed policy eliminating small orders caused plaintiff to lose at least four customers, including his largest account, which the court found amounted to a "material breach" under Massachusetts law. *Id.* at 846. Defendants have not shown an analogous breach here. Even if defendants could show contractual rights to certain commissions or confidentiality under the EAP, which they have not, defendants still have not shown that these alleged breaches constitute a "substantial breach" of their employment agreements.

At oral argument, defendants also argued that Israel should be excused from the terms of the restrictive covenants he signed under the theory that he was constructively discharged based on his employer's allegedly accidental disclosures that he was on probation and seeking help through the EAP. In order to prove the defense of constructive discharge under Michigan law, Israel must show that "working conditions [became] so difficult or unpleasant that a reasonable person in the employee's shoes would [have felt] compelled to resign." *Vagts v. Perry Drug Stores*, 204 Mich.App. 481, 487, 516 N.W.2d 102, 105 (1994) (citing *Mourad v. Automobile Club Ins. Ass'n*, 186 Mich.App. 715, 721, 465 N.W.2d 395 (1991)). The defense of constructive discharge is a factually intensive one and the proofs presented in connection with the time pressures of the preliminary injunction hearing are not sufficient to allow the court to address the issue. Given the fact that it is the NASD arbitrators who will ultimately decide the merits of this action, it appears best to leave Israel's constructive discharge defense untouched for the arbitrators to consider in the first instance. This is especially true given that Merrill Lynch appears to have a strong claim for alleged violations of Michigan's Uniform Trade Secrets Act, regardless of the applicability of the constructive discharge defense.

### B. *Irreparable Injury*

■ It is well established that a preliminary injunction may not be entered where money damages will make the movant whole. *Performance Unlimited, supra*, 52 F.3d at 1382. Merrill Lynch argues that it will be irreparably harmed unless injunctive relief is granted because (1) monetary damages cannot be calculated with certainty because there is no way to measure every future investment flowing from the exploitation of existing clientele and the potential future clients they might refer, and (2) Merrill Lynch clients who believe their financial records are held in confidence will lose their trust and confidence in Merrill Lynch based on defendants' conduct.

Defendants respond that money damages are ascertainable and that these cases routinely settle based on a percentage of the broker's commissions over the preceding twelve months. Defendants further argue that Merrill Lynch can compete for the business of their former clients, thus precluding any irreparable harm. More-

over, defendants argue that the availability of expedited arbitration before the NASD obviates any alleged irreparable harm as the arbitration should occur in the next three to five weeks, and all damages lost within that narrow window of time can be calculated with absolute precision. In addition, defendants offered to stipulate not to raise the proximate cause issue at arbitration and to stipulate that damages, if awarded, would include all commissions they earned from servicing former Merrill Lynch clients (all of whom were admittedly solicited) who followed them to Paine Webber.

The problems with defendants' arguments are several. First, although a swift settlement of this suit, as in every case, is a possibility, such a desirable outcome does not mean that plaintiff's claims can be readily quantified. It merely means that all sides are willing to reach a compromise. Although settlement of this suit is one possible outcome of this matter, it is also possible that the NASD arbitrators will continue the injunctive relief entered here for up to the one year promised in defendants' restrictive covenants. While defendants are correct that if injunctive relief is denied now, the arbitrators will be able to calculate damages incurred by Merrill Lynch over the next 30 days, this does not mean they will not be able to predict how the loss of those customers would impact Merrill Lynch over time. The Sixth Circuit has held that the loss of customer goodwill can amount to irreparable injury because the damages flowing from such an immeasurable loss are extremely difficult to compute. *See Basicomputer Corporation v. Scott*, 973 F.2d 507, 511 (6th Cir.1992). There is simply no way of predicting (1) how clients' portfolios might have grown if not transferred away from Merrill Lynch, (2) what assets existing clients may earn, inherit, or even win over time, nor (3) what potential referrals transferring clients might have made. The goodwill of Merrill Lynch is an invaluable intangible which, despite defendants' protestations to the contrary, is not easily quantified. Given the complexities and uncertainties of developing a client base, unless injunctive relief is granted now, the impact of defendants' breaches on Merrill Lynch simply cannot be measured.

Defendants' argument that Merrill Lynch can compete to win its former clients back also lacks merit. Based on its contractual rights, Merrill Lynch does not have to compete with its former brokers for the business defendants attempted to convert. Merrill Lynch is entitled to the benefit of its bargain which prevents its former brokers from soliciting business within one year of leaving the firm. To the extent defendants already have done so here, in clear contravention of their contracts, defendants cannot be allowed to benefit from their wrongdoing on the chance that Merrill Lynch might win customers back through its own aggressive marketing. Moreover, defendants' offer to stipulate not to raise the "proximate cause" question is really a red herring. The contracts of three of the four defendants provide that the brokers will not accept the business of any clients they wrongfully solicit for a period of one year. Given this contractual agreement, there simply is no proximate cause question for the brokers to waive in the first place. In sum, having carefully considered the arguments of both sides, Merrill Lynch has shown that it will suffer irreparable injury if injunctive relief is not granted.

### C. *Substantial Harm to Others*

Defendants' conduct in abruptly resigning and soliciting former clients has created much havoc. The wake created by their disruptive behavior has left all involved in this matter a loser of sorts. Merrill Lynch has been harmed by the loss of over $1.3 billion in assets and the talents and gifts of the four defendants. Defendants' former clients have been harmed in that their broker-client relationships have been unilaterally and unexpectedly severed. Customers who had felt

that their investments were secure through the broker of their choosing now must find a new financial advisor. The broker-client relationship, however, is a two-way street. It is not merely the client's choice of broker which must be preserved, but the broker has a say in who his clients will be as well. In this case, the brokers agreed that they would not do business with any clients they solicited in violation of their contracts. Having wrongfully solicited, defendants themselves are to blame for severing the broker-client relationship. In addition to losing their financial advisors, customers have suffered an additional burden in that they have been subjected to the presumably unwanted marketing techniques, however subtle, of both sides. Instead of merely maintaining what they believed to be stable relationships, clients have been exposed to a barrage of competition for their continued business from the very persons and firm to whom they had entrusted their investments.

Even the defendants, who upon joining Paine Webber received extremely lucrative bonuses, have suffered significant hardships as a result of the deal. Despite years of effort spent developing their client bases, defendants now are prohibited by the court's TRO from servicing any of their former Merrill Lynch clients, all of whom were wrongfully solicited. Although there is no dispute that these highly compensated individuals are in no jeopardy of starving if the injunction is entered, there is no doubt that the manner and volume of their business will be significantly impacted. In considering the hardships to all involved, however, those suffered by defendants are the least deserving of the court's consideration as their travails were needlessly self-imposed, unlike the burdens on customers and Merrill Lynch, which were not chosen, but rather were inflicted by defendants' contractual breaches.

In balancing the hardships to parties and non-parties if the injunction is entered, the scales tip heavily in favor of granting injunctive relief. The court is persuaded that granting injunctive relief will, to the extent possible, maintain the status quo by requiring defendants to return confidential data wrongfully diverted, ending further solicitation of Merrill Lynch's customers, and enjoining defendants from profiting from their misconduct. Although it is true that some customers, perhaps even a significant number of them, will be harmed by the entry of an injunction which will prevent them, at least for the next 30 days, from transferring their accounts to defendants at Paine Webber, equity requires that the injunction be entered. There is no dispute that defendants breached their promises not to solicit their former Merrill Lynch customers. To deny the injunctive relief Merrill Lynch now seeks, a remedy specifically provided for in three of the four defendants' contracts, and required as to all of the defendants under the four factors discussed in this opinion, would amount to a nullification of defendants' employment agreements. Such a result would create an incentive for other brokers to violate their agreements without fear of reprisal.

Although the entry of injunctive relief is required under these circumstances, the court is cognizant that this result not only penalizes the defendants, who in fact breached their restrictive covenants, but their former clients as well who are innocent victims. Any harm to former customers prevented from moving their accounts to defendants' care at Paine Webber is minimized, however, by the extremely temporary nature of this injunction. In conclusion, although injunctive relief will harm defendants' former clients who wish to transfer their accounts, this short-lived harm is outweighed by the potential harm to Merrill Lynch and the need to vitiate defendants' contractual agreements.

### D. Public Interest

In weighing whether the public interest will be served in granting the

injunctive relief sought, the court finds that this factor can cut both ways. In this case, the public interest, that is the interest of non-parties, is measured largely in terms of the customers affected by the brokers' resignations and violations of their restrictive covenants. It is no doubt true, as defendants have argued, that many of their former clients would want their accounts to follow the brokers to Paine Webber, regardless of their solicitation efforts, based on the special relationship developed between client and broker. The court is mindful that some of these relationships have been cultivated for many years, especially in the case of Ran who has been with the firm since 1983. In addition, many of the client relationships formed at a time when the brokers were not even with Merrill Lynch. For example, 90% of Israel's business at Merrill Lynch consisted of client relationships he retained and developed while at Morgan Stanley. In addition, the court is well aware that several of defendants' former clients have submitted affidavits stating their strong desire to continue their professional relationships with these particular brokers and their wish to transfer their accounts from Merrill Lynch to defendants. In fact, five of the defendants' former clients felt so strongly about their wish to continue doing business with defendants, that when prevented from doing so by this court's TRO, they retained counsel and filed a motion to intervene in this lawsuit. Although some customers undoubtedly wish to transfer accounts to defendants, at least 500 of them having returned account transfer forms based on defendants' solicitation letter, it is unclear if denying injunctive relief at this juncture would truly serve their best interests. However this court rules, it is entirely possible that the NASD arbitrators will decide to grant injunctive relief which may last as long as the year provided for in the contracts. Given this possibility, it does not make sense to allow customers to transfer their accounts to Paine Webber now when the arbitrators' decision may require them to move their funds to another brokerage firm in the next month. To avoid the confusion of repeated transfers, it appears best to preserve the status quo as much as possible pending arbitration.

Moreover, despite the thwarted intentions of at least a number of defendants' former clients, who cannot invest their money through defendants despite their wish to do so, the customers are not the only public interest which this court must consider. The public has another important interest which is at stake in this case: the enforcement of contracts. Unless the court enforces the terms of the contracts entered into by the sophisticated parties and entities in this case, the court will be undermining the legitimate business expectations not only of the parties here, but of all contracting parties. It is the knowledge that valid and enforceable contractual agreements will be enforced in courts of competent jurisdiction which allows our competitive marketplace to thrive. Without such a rule of law, parties could not rely on contracts to conduct their affairs. In this case, there is no dispute that defendants expressly agreed not to solicit their former Merrill Lynch clients for a period of one year, but did so anyway in a deliberate and calculated violation of their restrictive covenants. Defendants knew that it was likely Merrill Lynch would sue to enforce their contracts, and knew that injunctive relief was a distinct possibility. Appreciating these risks, defendants hired counsel before resigning and took their chances that they would prevail in court or arbitration. At least in this forum, defendants' gamble has not payed off.

Within the next month, however, defendants will have the opportunity to make their case to the NASD arbitration panel. The preliminary injunction to be entered here is of extremely limited duration and will last only for a period of 30–days or until the NASD arbitration panel addresses the issue, whichever comes first. The reason for the time limit is to keep pressure on counsel to expedite the arbitration

procedure. Given the extremely temporary nature of the relief provided here, it is the court's hope that interference with the customers' interests will be minimal and the rule of law will be upheld.

## IV. DEFENDANTS' MOTION TO MODIFY THE INJUNCTION

Having decided that plaintiff's motion for a preliminary injunction should be granted, the court now turns to defendants' arguments in support of modifying the terms of the TRO. Defendants argue that if injunctive relief is granted, that the relief granted in the TRO should be changed in one or more of the following three ways: (1) allow the brokers to accept any account transfers returned by customers they solicited, until NASD arbitration is complete, on condition that they maintain an accounting of all commissions earned on those accounts under the theory that this will allow damages to be measured with precision, (2) allow the brokers to keep all customers they had prior to beginning their employment with Merrill Lynch, and (3) set a time limit for the duration of the preliminary injunction in order to expedite arbitration. The court rejects the first two proposals, but as previously discussed, accepts the third one.

 As to the first proposal, the court has already rejected the argument that damages can be ascertained if injunctive relief is denied. Thus, defendants' suggestion that an accurate accounting of damages can be done merely be counting up commissions earned until the arbitrators rule lacks merit. The damages incurred by the loss of clients, and potential future losses incurred through the elimination of referrals those clients may have generated, is beyond calculation. Moreover, allowing defendants to accept the account transfers would reward them for breaching the contract. At least in the case of three of the brokers, who agreed to injunctive

relief should they breach their contracts, allowing the transfers to go forward would nullify the contracts. Similarly, defendants' argument that they should be able to keep clients they brought with them to Merrill Lynch is an argument that they should have made before signing employment agreements to the contrary. Three of the brokers further agreed that in the event they breached the non-solicitation restrictive covenants, they would not do business with clients they had solicited. In light of these clear contractual promises, there is no room for the court to consider defendants' position as to what a more "fair" restrictive covenant might have been. Finally, the court is persuaded by defendants' arguments in favor of imposing a time limit on the duration of the preliminary injunction. With the hope that such a time limit will promote and inspire an expedited review of this matter in arbitration, the court shall require that the injunction terminate as of the date the arbitrators rule, or on October 21, 1999,[3] whichever comes first.

## V. CONCLUSION

Balancing the four factors to be considered in determining whether to grant injunctive relief, Merrill Lynch has demonstrated that its motion for preliminary injunction should be granted. Accordingly,

IT IS ORDERED that plaintiff's motion for a PRELIMINARY INJUNCTION hereby is GRANTED. The terms of this INJUNCTION are set forth below, and have been substantially agreed upon as to form by the parties:

1. Defendants are enjoined and restrained, directly or indirectly, and whether alone or in concert with others, including any officer, agent, representative, and/or employee of

---

**3.** October 21, 1999 is 30 days from the date the court granted the preliminary injunction

on the record.

defendants' new employer, Paine-Webber, from:

(a) soliciting any business from any client of Merrill Lynch whom defendants served, assisted in serving, or whose name became known to defendants while in the employ of Merrill Lynch, including the initiation of contacts concerning defendants' new employment with PaineWebber, and further, from accepting any business or account transfers from any of said customers whom defendants, or anyone acting on defendants' behalf or in concert with defendants, have solicited and/or initiated contact with at any time in the past concerning defendants' new employment at PaineWebber or for the purpose of doing business with defendants' new employer, PaineWebber (excluding members of Defendants' immediate families). Furthermore, as to defendant Stone only, the above prohibition against soliciting and from accepting any business or account transfers shall not apply to any clients serviced primarily by defendant Stone who reside more than one hundred (100) miles from Merrill Lynch's Farmington Hills, Michigan office; and

(b) using, disclosing or transmitting for any purpose, including solicitation of said clients, the information contained in the records of Merrill Lynch.

2. The security of $0 provided for in the TRO dated September 7, 1999 and modified on September 13, 1999, remains in full force and effect;

3. To the extent not already done so pursuant to the court's order dated September 7, 1999 and modified on September 13, 1999, defendants, and anyone acting in active concert or participation with defendants who receives actual notice of this order, including any agent, employee, officer or representative of defendants' present employer, PaineWebber, are further ordered to return to Merrill Lynch's Farmington Hills, Michigan office any and all information pertaining to Merrill Lynch clients, whether in whole or partial form, and whether in original, copied, computerized, handwritten or any other form, and to purge such information from their possession, custody or control, within twenty-four (24) hours of service of this order upon defendants or their legal counsel. Counsel for defendants, as an officer of the court, is instructed to hold in escrow the computer tape that has been downloaded from defendants' computer at PaineWebber pending the hearings in arbitration.

4. This order shall remain in full force and effect for 30 days from September 21, 1999 or until a decision is rendered by a panel of arbitrators in accordance with the Code of Arbitration Procedure of the National Association of Securities Dealers, whichever comes first. Plaintiff may petition this court for an extension of this order for equitable reasons. This order may be modified or dissolved by the NASD arbitration panel.

5. The parties are directed to proceed regarding all matters concerning the terms of this order in an expedited arbitration before a duly appointed panel of arbitrators in accordance with the Rules set forth in the NASD Code of Arbitration Procedure, without waiver or modification of the parties' rights thereunder.

6. Defendants, or their current employer on their behalf, are directed to send the letter, agreed upon as to form by plaintiffs, attached to this order, to those customers who sent defendants account transfer forms as of September 21, 1999. The letter shall be sent, in the form attached below, without additional en-

closures or information, within three business days after entry of this order. Defendants shall provide plaintiff with the names and addresses of all recipients at the time the letter is sent.

7. Plaintiff is directed to provide the phone number and location of defendants at PaineWebber to any customer contacting plaintiff requesting to speak to defendants.

IT IS FURTHER ORDERED that defendants' motion to modify or vacate the TRO is DENIED AS MOOT.

Although neither party has requested an order staying this matter pending arbitration, pursuant to the Federal Arbitration Act, 9 U.S.C. § 3, IT IS FURTHER ORDERED that this matter is STAYED pending arbitration and is CLOSED for administrative purposes only. This matter may be reopened upon motion of either party upon completion of the arbitration procedures.