**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Plaintiff,**

v.

**Donald L. RODGER, Robert A. Bowen, and James W. Igo, Defendants.**

**No. Civ.A.1:CV–99–1821.**

United States District Court, M.D. Pennsylvania.

Nov. 4, 1999.

Harvey Freedenburg, McNees, Wallace & Nurick, Harrisburg, PA, Joseph A. Dougherty, Susan M. Guerette, Rubin & Associates, P.C., Paoli, PA, for Merrill Lynch, Pierce, Fenner Smith, Inc., plaintiff.

Timothy J. McMahon, Marshall, Dennehey, Warner, Coleman & Goggin, Harrisburg, Pa, Anthony Paduano, Jordan D. Becker, Smith Campbell & Paduano, New York City, for defendants.

## MEMORANDUM

CALDWELL, District Judge.

I. *Introduction.*

The plaintiff, Merrill Lynch, Pierce, Fenner & Smith, Inc., filed this suit seeking temporary injunctive relief against three financial consultants (commonly known as stock brokers), formerly in its employ, until there is an arbitral resolution of its claim against them for violating certain restrictive covenants in their employment agreements. The defendants are Donald L. Rodger, Robert A. Bowen, and James W. Igo, now working for Prudential Securities Incorporated.

We are considering Merrill Lynch's motion for a preliminary injunction under Fed.R.Civ.P. 65(a). The motion seeks to enjoin the defendants from, among other things, soliciting any business from any Merrill Lynch client that they served or whose names became known to them while they were employed by Merrill Lynch.

On November 2, 1999, we held a hearing on the motion. Based on the parties' submissions and the evidence produced at the hearing, the following is the background to the motion, including pertinent procedural history.

## II. *Background.*

### A. *Factual Background.*

The three defendant stockbrokers formerly worked for Merrill Lynch at its office in York, Pennsylvania as financial consultants. Defendant Rodger began in 1979, Bowen in August 1986, and Igo in November 1995. Upon beginning their employment with Merrill Lynch, they each signed employment agreements containing restrictive covenants. Rodger signed an agreement captioned a "Financial Consultant Agreement," Bowen an agreement captioned an "Account Executive Agreement," and Igo an agreement captioned a "Financial Consultant Employment Agreement and Restrictive Covenants."

The contractual language varied but, in pertinent part, all three agreements imposed the following obligations on the defendants. First, the defendants agreed that all records of Merrill Lynch, including client names and addresses, were the property of Merrill Lynch and were to be treated as Merrill Lynch's confidential information. Second, after their employment ended, the defendants would not solicit for a period of one year Merrill Lynch clients that they had served, or any other Merrill Lynch clients they had come to know about while employed by Merrill Lynch. Defendant Rodger's and Bowen's agreements limited this restriction to clients residing within 100 miles of the Merrill Lynch office where the defendants worked.

Third, all three agreements provided for some form of equitable relief. Rodger and Bowen agreed that they would:

consent to the issuance of a temporary restraining order or a preliminary or permanent injunction to prohibit the breach of any provision of this contract, or to maintain the status quo pending the outcome of any arbitration proceeding which may be initiated.

Complaint, exhibits A and B).

Igo's agreement was more detailed as to equitable relief. If he breached any of the pertinent provisions, it provided as follows:

I agree that Merrill Lynch will be entitled to injunctive relief. I recognize that Merrill Lynch will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Merrill Lynch or to protect and preserve the status quo. Therefore, I CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER or A PRELIMINARY or PERMANENT INJUNCTION....

(Complaint, exhibit C) (capitals in original). This clause further specified that the injunctive relief could include not just a prohibition on solicitation but on "accepting business from any Account who was solicited" in violation of the agreement "or whose records and information was used" in violation of it.

Rodger's and Bowen's agreements specifically provided that the agreements would be "construed, and the validity, performance and enforcement thereof shall be governed by the laws of the State of Pennsylvania." Igo's agreement had a choice-of-law provision that was not as direct but which also called for the application of Pennsylvania law.

Late in the afternoon of Friday, October 15, 1999, the defendants resigned from Merrill Lynch without notice and immediately began working for Prudential. They took with them names and addresses of clients they had serviced while at Merrill Lynch.

On the same day, Prudential used this information taken from Merrill Lynch records to mail letters to most of these clients and signed by the defendant who had handled their account, informing them that the defendant had moved to Prudential and, inferentially, soliciting their business. Enclosed with the letter was a transfer form

for each account already filled out with the client's name. On Monday, October 18, 1999, Prudential sent out another group of letters.

At the same time, beginning on Friday night and continuing through the weekend, the defendants telephoned a number of clients and informed them of their new affiliation.

Shortly before they departed Merrill Lynch, the defendants were servicing a significant number of clients. Rodger was responsible for some $160 million in assets (significantly reduced shortly before his departure for reasons we need not discuss) and would have generated about $900,000 in annualized commissions for Merrill Lynch in 1999. Bowen was responsible for some $180 million in assets in partnership with another broker which generated from his efforts about $400,000 in commissions for Merrill Lynch during the last 12 months. Igo was responsible for some $62 million in assets which would have generated about $400,000 in annualized commissions for Merrill Lynch for 1999. About 18 to 20% of the assets of the Merrill Lynch York office was being handled by these defendants.

Rodger was not always a broker at Merrill Lynch. For ten years, he was an office manager. He became a broker in 1989 and at that time was assigned some $35 million in assets from a retiring broker. He was eventually put in charge of the D.L. Rodger Group, an informal partnership within Merrill Lynch which included Bowen and Igo. The Group had inherited some clients from retiring Merrill Lynch brokers.

At the November 2 preliminary-injunction hearing, Rodger testified that the TRO has prevented him from contacting clients, and if continued, in effect, would cause him to start over in the business at age 56. All three brokers testified that an injunction would cause financial hardship, but all three admitted that they realized at the time their decisions to leave Merrill Lynch might result in litigation against them.

Also at the hearing, the defendants submitted 24 affidavits from customers serviced by the defendants. These customers affirmed which defendant they considered to be their broker, that they wanted to transfer their accounts from Merrill Lynch to Prudential so that their accounts could continue to be handled by the broker of their choice, and that they had "not been solicited, implored, pressured, coerced, urged, extolled or threatened . . ." to make this choice, which they make freely. They "demand that Merrill Lynch transfer [their] assets without further delay and do nothing to interfere with [their] rights to do so." (Brackets added).

These demands were made in accord with rules of the New York Stock Exchange (NYSE) and NASD governing the responsibility of brokerage firms to honor their clients' requests to transfer their accounts to another firm. Both NYSE Rule 412(a) and NASD Rule 11870(a) require a brokerage to honor such a request expeditiously.[1]

B. *Procedural History.*

On Monday, October 18, 1999, Merrill Lynch filed its complaint, invoking our di-

---

1. NYSE Rule 412(a) and (b) provide, in pertinent part, as follows:

(a) When a customer whose security account is carried by a member organization (the "carrying organization") wants to transfer the entire account to another member organization (the "receiving organization") and gives written notice of that fact to the receiving organization, both organizations must expedite and coordinate activities with respect to the transfer.

(b) Upon receipt from the customer of a signed broker-to-broker transfer instruction to receive such customer's securities account, the receiving organization will immediately submit such instruction to the carrying organization.

NASD Rule 11870(a) and (b) essentially mirror this language.

versity jurisdiction, and alleging that the defendants were violating the employment agreements by using Merrill Lynch documents to solicit Merrill Lynch clients on behalf of Prudential. Merrill Lynch made state-law claims for breach of contract, conversion, breach of fiduciary duty and unfair competition.

The plaintiff does not seek damages or permanent injunctive relief. Instead, it seeks only temporary injunctive relief to enforce the restrictive covenants until its claim against its ex-employees can be litigated in arbitration under Rule 10335(g) of the National Association of Securities Dealers (NASD) Code of Arbitration Procedure. To that end, at the same time it filed suit in this court, Merrill Lynch filed a statement of claim in arbitration against the defendants.

Also on October 18, the plaintiff moved for a temporary restraining order prohibiting the defendants from soliciting Merrill Lynch clients, including clients they may have serviced, or using any documents they may have taken with them. We granted the TRO the same day. On October 20, we modified the order to specify that it was not intended to limit or affect the arbitration of the dispute under NASD rules.

On Thursday, October 21, 1999, under NASD Rule 10335, the defendants sought interim injunctive relief from a single arbitrator, as allowed by NASD rules. On October 25, the single arbitrator declined to disturb our TRO, relying in part on NASD Rule 10335(g), reasoning that any relief from our TRO had to come from an arbitration panel, rather than a single arbitrator. In material part, that rule provides that if a court issues an injunction, the arbitration of any matter that is the subject of the injunction will proceed in an expedited manner to a resolution by the arbitration panel appointed to hear the matter.

III. *Discussion.*

A. *The Authority of the Court to Grant Injunctive Relief While an Arbitration Is Pending.*

The defendants argue that the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1–307, requires us to stay this action pending the outcome of the arbitration before the NASD panel. They rely on section 3 of the FAA which requires a federal court to refer a case to arbitration if the parties have agreed to do so.

We disagree. Although some circuits have ruled that the FAA requires that a case be sent directly to arbitration, *see, e.g., Merrill Lynch v. Hovey,* 726 F.2d 1286 (8th Cir.1984), the Third Circuit has held that a court can grant preliminary injunctive relief under the FAA pending arbitration. *See Ortho Pharmaceutical Corp. v. Amgen, Inc.,* 882 F.2d 806 (3d Cir.1989). Indeed, NASD Rule 10335(g) recognizes the right of a party to seek preliminary injunctive relief from a court rather than from an arbitrator. In these circumstances, the court should also not simply exercise its discretion to stay the case, as the defendants suggest, and send the dispute to arbitration. Instead, it should exercise its jurisdiction.

B. *The Merits of Merrill Lynch's Motion for Preliminary Injunctive Relief.*

Initially, we must address the plaintiff's argument that, because the defendants contractually agreed to injunctive relief if they violated the terms of their agreements, we must grant that relief if breaches are proven.

As cited by the plaintiff, there is authority for this position. *See, e.g., Merrill Lynch v. Dutton,* 844 F.2d 726 (10th Cir.1988). However, we disagree. We believe that contractual language cannot dictate to the court whether it will issue injunctive relief. *See Dice v. Clinicorp., Inc.,* 887 F.Supp. 803 (W.D.Pa.1995); *Merrill Lynch v. Bennert,* 980 F.Supp. 73, 76

(D.Me.1997). Thus, we will rely on the traditional standard for granting injunctive relief.

■ The traditional four-factor test for the grant of a preliminary injunction is as follows:

(1) the likelihood that the plaintiff will prevail on the merits at the final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.

*New Jersey Hospital Ass'n v. Waldman,* 73 F.3d 509, 512 (3d Cir.1995). "The injunction shall issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *Id.* at 513 (quoted case omitted). Thus, a "plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit–Mar Enterprises, Inc.,* 176 F.3d 151, 153 (3d Cir. 1999).

The Third Circuit has also stated a fifth factor that the court should consider, "the possibility of harm to other interested persons from the grant or denial of the injunction." *Ortho Pharmaceutical Corp. supra,* 882 F.2d at 812–13. *See also Campbell Soup Co. v. ConAgra, Inc.,* 977 F.2d 86, 91 (3d Cir.1992); *Bradley v. Pittsburgh Board of Education,* 910 F.2d 1172, 1175 (3d Cir.1990).

### 1. *Likelihood of Merrill Lynch Prevailing on the Merits.*

Merrill Lynch argues that it has a reasonable likelihood of prevailing on the merits because Pennsylvania enforces restrictive covenants against former employees who try to use their previous employer's customer lists. The plaintiff cites *John G. Bryant Co., Inc. v. Sling Testing & Repair, Inc.,* 471 Pa. 1, 369 A.2d 1164 (1977). In that case, the Pennsylvania Supreme Court gave its rationale for enforcing these types of covenants:

The covenant seeks to prevent more than just the sales that might result by the prohibited contact but also the covenant is designed to prevent a disturbance in the relationship that has been established between appellees and their accounts through prior dealings. It is the possible consequences of this unwarranted interference with customer relationships that is unascertainable and not capable of being fully compensated by money damages.

471 Pa. at 8, 369 A.2d at 1167.

Merrill Lynch also cites *Merrill Lynch v. Masri,* 1996 WL 283644 (E.D.Pa.), which found that Merrill Lynch had a likelihood of success on the merits in enforcing its restrictive covenants in that case. In doing so, the court relied on cases from other jurisdictions that have enforced restrictive covenants on behalf of Merrill Lynch against former brokers. *See Merrill Lynch v. Bradley,* 756 F.2d 1048 (4th Cir. 1985); *Merrill Lynch v. Salvano,* 999 F.2d 211 (7th Cir.1993); *Merrill Lynch v. Dutton,* 844 F.2d 726 (10th Cir.1988); *Ruscitto v. Merrill Lynch,* 777 F.Supp. 1349 (N.D.Tex.1991); and Merrill Lynch v. Hagerty, 808 F.Supp. 1555 (S.D.Fla.1992). Additionally, Merrill Lynch points to a number of unpublished dispositions from various federal and state courts that have reached similar conclusions.

In opposition, the defendants argue that the issue of permanent injunctive relief will be finally settled by the arbitrators and, they maintain, under "well developed principles of arbitral decision (sic) in the securities employment area" (opposition brief at p. 14), arbitrators routinely refuse to enforce contractual provisions like Merrill Lynch's. Thus, because Merrill Lynch will not likely succeed in the arbitration, the defendants contend we should find in their favor on this factor. *See Merrill Lynch v. McCullen,* 1995 WL 799537 at *2 (S.D.Fla.).

We reject this position for two reasons. First, we must evaluate the first factor against the controlling law, not what the

arbitrators may do. Second, Merrill Lynch has supplied us with arbitral decisions in which its contractual provisions were enforced, so citation to opposing decisions does not assist the defendants.

The defendants next argue against likelihood of success on the merits that NYSE Rule 412 and NASD Rule 11870 establish that Merrill Lynch's restrictive covenants are illegal. (As noted above, these rules require brokerages to promptly honor customers' requests to transfer their accounts to another brokerage.) We disagree with this interpretation of these rules. They operate between the brokerage and its customers, not the brokerage and its employees.

The defendants finally argue that industry practice and custom ignores these restrictive covenants and that even Merrill Lynch has recruited brokers in violation of these obligations. The difficulty with this position is that it says that widespread violation of the law justifies ignoring it. To the contrary, we must apply the law to the case at hand, which in Pennsylvania enforces restrictive covenants. *See Merrill Lynch v. Ran,* 67 F.Supp.2d 764, 775 (E.D.Mich.1999) ("Such an offensive industry practice is not grounds for refusing to enforce the valid restrictive covenants at issue here, however distasteful the court finds the untoward business practices of the brokerage firms."). Thus, we need not, and cannot, concern ourselves with other situations.

We agree with Merrill Lynch's position and conclude that it has satisfied the first requirement for a preliminary injunction.

### 2. *Irreparable Injury.*

Merrill Lynch argues that it will suffer irreparable injury on three grounds if the preliminary injunction does not issue. The first ground is that damages from the loss of its customers is incalculable so an injunction is required.

There is support in the case law for this position, as Merrill Lynch's citations show. In *Merrill Lynch v. Masri,* 1996 WL 283644 (E.D.Pa.), citing *John G. Bryant*

*Co., supra,* the court, in issuing a preliminary injunction against an ex-broker for Merrill Lynch, noted that interference with customer relations was unascertainable in damages. As also stated in *Merrill Lynch v. Stidham,* 658 F.2d 1098 (5th Cir.1981):

> The injury here is such that damages could not adequately compensate. Were defendants permitted by the law to exploit the clientele of their former employers, every investment that reasonably flowed from the exploitation should be included in the damages award. How such a figure could be arrived at escapes us.

*Id.* at 1102 n. 8.

We agree with this position, although we recognize that the defendants have cited authority to the contrary. *See Merrill Lynch v. Bishop,* 839 F.Supp. 68, 74 n. 5 (D.Me.1993) (damages from lost securities customers were ascertainable by looking at account histories). *See also Merrill Lynch v. McCullen,* 1995 WL 799537 at *3 (S.D.Fla.).

Merrill Lynch's second ground of irreparable injury is that its customers will lose trust and confidence in it if they discover that ex-employees have divulged to others private financial information like account value, market transactions and investment assets. Some courts have accepted this ground. In *Merrill Lynch v. Kramer,* 816 F.Supp. 1242, 1247 (N.D.Ohio 1992), the court stated:

> Plaintiffs argue with equal strength that irreparable and immeasurable harm lies in the fact that Merrill Lynch clients, when they discover that their financial information, market transactions, and investment assets which they presumed were held in confidence have been disclosed, will lose trust and confidence in Merrill Lynch.

In *Merrill Lynch v. Zimmerman,* 1996 WL 707107 at *2 (D.Kan.), the court stated that a TRO was justified because otherwise ("the plaintiff will lose good will from

certain clients when they discover that their supposedly confidential information was stolen"). *See also Merrill Lynch v. Barnett,* 1990 WL 303428 at *4–5 (W.D.Mich.) (quoting *Merrill Lynch v. Hess,* No. 88–160 (M.D.Pa.) (Herman, J.)) Indeed, as the plaintiff points out, this ground or some variation on it, was accepted by the undersigned in an unpublished memorandum in *Merrill Lynch v. DeBord,* No. 1:CV–90–1260 (M.D.Pa. July 10, 1990) (Caldwell, J.).

We recognize that certain clients do not consider the defendants' conduct a breach of confidence, but others very well might. Thus, we accept this second ground as a valid basis for claiming irreparable injury.

Merrill Lynch's third ground for irreparable injury is that if an injunction does not issue, the plaintiff's stability will be threatened because its competitors will be encouraged to induce other Merrill Lynch employees to breach their Merrill Lynch employment agreements. *See Kramer, supra,* 816 F.Supp. at 1242; *Merrill Lynch v. Patinkin,* 1991 WL 83163 at *6 (N.D.Ill.) (extending a TRO because the failure to do so "would leave Merrill Lynch vulnerable to the same conduct from other employees. Hence, the potential harm [Merrill Lynch] faces, on several levels, is enormous.") (brackets added) (footnote omitted); *Zimmerman, supra,* 1996 WL 707107 at *2.

We reject this argument because under Third Circuit law:

> [M]ore than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief has been characterized as a "clear showing of immediate irreparable injury," or a "presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury...."

*Acierno v. New Castle County,* 40 F.3d 645, 655 (3d Cir.1994) (quoted case omitted). Merrill Lynch presented no evidence that it would suffer immediate irreparable injury from other brokers leaving if these defendants were not enjoined.

Nonetheless, based on the first two grounds, Merrill Lynch has satisfied the second requirement for a preliminary injunction.

3. *The Extent to Which the Defendants Will Suffer Irreparable Harm if the Preliminary Injunction Is Issued.*

This third factor requires us to balance the irreparable harm to the defendants against the irreparable harm to Merrill Lynch. *See Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.,* 143 F.3d 800, 805 (3d Cir.1998).

■ At the preliminary-injunction hearing and in pre-hearing affidavits, the defendants asserted they and their families would suffer financial harm if the defendants could not work for their clients. They also mentioned damage to their professional reputations.

We do not view either of these as irreparable injury. We fail to see how the defendants reputations will suffer if they have to abide by routine restrictive covenants in their employment agreements. Additionally, any injunctive relief we grant will only be temporary until the arbitrators decide the issue of permanent injunctive relief.

In these circumstances, the irreparable injury to the plaintiff easily outweighs any injury to the defendants. Further, as Merrill Lynch points out, citing *Kramer, supra,* 816 F.Supp. at 1248, the defendants can work for Prudential, as long as they do not solicit Merrill Lynch customers.

Moreover, the injury to the defendants was self-inflicted. Realizing that Merrill Lynch would probably try to enforce its employment contracts, they breached them anyway. *Pappan Enterprises, supra,* 143 F.3d at 806 ("The self-inflicted nature of any harm suffered by [the defendants] ... weighs in favor of granting preliminary injunctive relief.") (brackets added); *Ran, supra,* 67 F.Supp.2d at 779 ("In considering the hardships to all involved, however, those suffered by defendants are the least

deserving of the court's consideration as their travails were needlessly self-imposed").

### 4. *The Public Interest.*

Among other matters dealt elsewhere in this memorandum, the plaintiff argues that an injunction would serve the public interest by enforcing valid contractual provisions dealing with restrictive covenants. Conversely, the defendants argue that denial of an injunction would serve the public interest by preserving the public's right to maintain special relationships of trust and confidence.

■ These are merely abstract interests in seeing that the law is followed. Such interests are not sufficient in the Third Circuit to satisfy the fourth factor, either for or against an injunction. *See Continental Group, Inc. v. Amoco Chemicals Corp.,* 614 F.2d 351, 357–58 (3d Cir.1980); *Armstrong World Industries, Inc. v. Allibert,* 1997 WL 793041 at *18–19 (E.D.Pa.).

### 5. *The Possibility of Harm to Other Interested Persons From the Grant or Denial of the Injunction.*

Merrill Lynch argues that the harm to other persons is less than the harm it would suffer if the injunction were not granted. Specifically, the plaintiff maintains that a preliminary injunction would protect its investment, good will, reputation, trade secrets, methods of business operation and contract rights.

In opposition, the defendants argue that Merrill Lynch has ignored the harm to the customers they serviced while employed by Merrill Lynch. The defendants assert the harm to these clients would be substantial because the clients would be unable to work with brokers with whom they have developed a trusting relationship for their financial holdings. Conversely, Merrill Lynch would suffer almost no injury since it is a large brokerage company that could withstand the financial effect of losing these customers.

The most difficult part of deciding this motion has been weighing the impact on the innocent customers of the defendants' decision to breach their employment agreements. Two considerations are significant here. First, as noted, securities customers often develop a trusting relationship with their brokers and the clients consider this relationship irreplaceable. Second, the rules of the NYSE and NASD provide that a customer can direct a brokerage to transfer his or her account to another institution.

■ Nevertheless, the harm to these interested third parties does not outweigh the harm to Merrill Lynch. We reach this conclusion for three reasons. First, our injunction is only temporary and will last only until the arbitrators finally decide the issue of permanent injunctive relief. *See Ran, supra,* 67 F.Supp.2d at 780. Second, our decision does not mean that the customers' assets are frozen. They can still consult with Merrill Lynch or another brokerage besides Prudential as to what transactions to make in their accounts to meet market conditions. Third, refusing to vacate the current order serves the overall purpose of a preliminary injunction by maintaining the status quo. *Favia v. Indiana University of Pennsylvania,* 7 F.3d 332, 342 (3d Cir.1993). In turn, maintaining the status quo will allow the arbitration panel to provide orderly relief. *See Ran, supra,* 67 F.Supp.2d at 780 (noting that it would not make sense to allow transfers that may be rescinded by an arbitral ruling and that the status quo should prevail).

We note that other courts have sided with the brokerage company on this issue, as part of the public-interest factor. *See Masri, supra,* 1996 WL 283644 at *5 (Merrill Lynch's interest in its business investments and confidential customer information outweighed the "consumers' interest in dealing with a financial consultant of their choice"); *Orbach v. Merrill Lynch,* 1994 WL 900431 at *7 (E.D.Mich.1994) (the temporary harm to former clients from not being able to consult with their brokers is outweighed by other factors

counseling in favor of injunctive relief) (quoting *Kramer, supra*).

IV. *Conclusion.*

We will issue an order continuing the injunctive relief against the defendants set forth in our TRO. We see no reason to modify the relief to take into account the differing language between Rodger's and Bowen's agreements and Igo's. And since the only relief sought in this action was preliminary injunctive relief, we will close this file.

*ORDER*

AND NOW, this 4th day of November, 1999, upon consideration of the plaintiff's motion for preliminary injunctive relief, it is ordered that all outstanding motions in this case are dismissed as moot.

IT IS FURTHER ORDERED AND DECREED THAT:

1.  Plaintiff's request for a preliminary injunction is hereby granted according to the following terms:

2.  A preliminary injunction order shall issue immediately and the security previously posted by Merrill Lynch in support of the court's temporary restraining order, dated October 18, 1999, shall remain in full force and effect;

3.  Defendants are enjoined and restrained, directly and indirectly, and whether alone or in concert with others, including any officer, agent, representative, and/or employee of defendants' new employer, Prudential Securities Incorporated, from:

a) soliciting any business from any client of Merrill Lynch whom defendants served or whose name became known to defendants while in the employ of Merrill Lynch and, further, from accepting any business or account transfers from any of said customers whom defendants have solicited at any time in the past for the purpose of doing business with defendants' new employer, Prudential Securities Incorporated (excluding members of defendants' immediate families and any customers serviced by defendants Rodger and/or Bowen who reside more than one hundred (100) miles from the York, Pennsylvania office of Merrill Lynch); and

b) using, disclosing or transmitting for any purpose, including solicitation of said clients, the information contained in the records of Merrill Lynch.

4.  To the extent not already done so pursuant to the court's order of October 18, 1999, defendants, and anyone acting in active concert or participation with defendants who receives actual notice of this order, including any agent, employee, officer or representative of defendants' present employer, Prudential Securities Incorporated, are further ordered to return to Merrill Lynch's York, Pennsylvania office any and all information pertaining to Merrill Lynch clients whether in original, copied, computerized, handwritten or any other form, and to purge such information from their possession, custody or control, within twenty-four (24) hours of service of this order upon defendants or their legal counsel.

5.  This order shall remain in effect in full force until a final decision is rendered by a three-member panel of arbitrators duly appointed in accordance with the Code of Arbitration procedure of the National Association of Securities Dealers.

The parties are directed to proceed regarding all matters concerning the terms of this order in an expedited arbitration before a duly appointed panel of arbitrators in accordance with Section 10335(g) of the NASD Code of Arbitration procedure.

6.  The clerk of court shall close this file.