**MERRILL LYNCH, PIERCE, FENNER, & SMITH, INC.**

v.

**Todd E. NAPOLITANO**

**No. CIV.A. 00–CV–137.**

United States District Court, E.D. Pennsylvania.

Feb. 2, 2000.

Thomas J. Momjian, Rubin and Associates, P.C., Paoli, PA, for plaintiff.

Howard L. Kelin, Kegel, Chesters, Lapp & Miller, Lancaster, PA, for defendant.

## MEMORANDUM & ORDER

KAUFFMAN, District Judge.

Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") has moved for temporary injunctive relief against Todd E. Napolitano ("Napolitano"), a financial consultant formerly in its employ, until the resolution of its claim against him for violating restrictive covenants in his employment agreement. An arbitration hearing on the merits of this controversy is scheduled for February 16–18, 2000. For the reasons explained below, the requested preliminary injunctive relief will be granted.

### PROCEDURAL HISTORY

On January 10, 2000, Merrill Lynch commenced this action against Napolitano alleging four causes of action: (i) breach of contract; (ii) conversion of trade secrets, customer lists, and confidential business information; (iii) breach of fiduciary duty; and (iv) unfair competition. (docket # 1.) Merrill Lynch also filed a Motion for Temporary Restraining Order to enjoin Napoli-

tano from, among other things, "soliciting any business from any Merrill Lynch client whom he served or whose name became known to him while in the employ of Merrill Lynch." (docket # 2.)

The Complaint and Motion for Temporary Restraining Order were delivered to the Court on January 11, 2000, and the Court immediately conducted a hearing at which both parties were represented. At the conclusion of the hearing, the Court issued a Temporary Restraining Order ("TRO") that enjoined Napolitano from, among other things, soliciting any business from any client of Merrill Lynch whom he had served or whose name he had learned while working for Merrill Lynch, and from "using, disclosing, or transmitting for any purpose, including solicitation of said clients, the information contained in the records of Merrill Lynch ...." (docket # 3.) The TRO further provided that Napolitano "shall show cause before this Court on the 21st day of January, 2000 ... why a Preliminary Injunction should not be ordered according to the terms and conditions set forth above." (docket # 3.)[1]

Napolitano submitted a Brief in Opposition to Motion for Preliminary Injunction (docket # 5), and Merrill Lynch submitted a Supplemental Memorandum of Law in Response to Napolitano's Brief (docket # 6). On January 28, 2000, each party submitted Proposed Findings of Fact and Conclusions of Law.

### DISCUSSION

Upon consideration of the written submissions, the evidence submitted on January 27, 2000, and the oral argument, the Court concludes that the TRO granted on January 11, 2000 shall continue as a preliminary injunction pending the expedited determination of the merits of this case through securities industry arbitration pursuant to Rule 10335 of the National

1. On January 19, 2000, the parties stipulated to a continuation of the preliminary injunction hearing until January 25, 2000, and to an extension of the TRO through the conclusion of the preliminary injunction proceedings. The Court approved the stipulation on January 20, 2000, (docket # 4.) Because a snow storm prevented the Court from conducting the hearing on January 25 or 26, 2000, the hearing took place on January 27, 2000.

Association of Securities Dealers Code of Arbitration Procedure.

## A. FACTS

Merrill Lynch is a Delaware corporation maintaining its principal place of business at the World Financial Center, North Tower, New York, New York and transacting business in this judicial district at 8380 Old York Road, Elkins Park, Pennsylvania. (Compl.¶ 1.) Napolitano is a financial consultant and a former employee of Merrill Lynch. (Pl.'s Exs. 1–4; Vincent A. Crimaldi Aff. at ¶ 4.) He worked for Merrill Lynch from June 1997 until January 7, 2000, in Merrill Lynch's Elkins Park, Pennsylvania office. (Pl.'s Exs. 1–4; Vincent A. Crimaldi Aff. at ¶ 4.)

Before commencing his employment at Merrill Lynch, Napolitano executed a *Financial Consultant Employment Agreement and Restrictive Covenants*, which, in clear and unambiguous language, provides:

1. *All records*, whether original, duplicated, computerized, memorized, handwritten, or in any other form, *and all information* contained therein, including names, addresses, phone numbers, and financial information of any account, customer, client, customer lead or prospect ("Account"), are confidential and are the sole and exclusive property of Merrill Lynch. This information, whether provided to me by Merrill Lynch or by any Account, is entrusted to me as an employee and sale representative of Merrill Lynch. I will not use this information or remove any such records from the Merrill Lynch office except for the sole purpose of conducting business on behalf of Merrill Lynch. I agree not to divulge or disclose this information to any third party and under no circumstances will I reveal or permit this information to become known by any competitor of Merrill Lynch either during my employment or at any time thereafter.

This information is extremely valuable to Merrill Lynch and Merrill Lynch takes all reasonable measures to maintain its confidentiality and to guard its secrecy. This information is not generally known outside Merrill Lynch and within Merrill Lynch this information is confidential and used only a 'need to know' basis. This information is developed and acquired by great expenditures of time, effort, and money. This information is unique and cannot be lawfully duplicated or easily acquired. Consequently, I agree that these records and the information contained therein are the property of Merrill Lynch and are deserving of trade secret status and protection.

2. If, at any time, I resign from Merrill Lynch, provoke my termination, or am terminated for cause, I agree that for a period of one year following my termination I will not solicit by mail, by phone, by personal meeting, or by any other means, either directly or indirectly, any Account whom I served or whose name became known to me during my employment at Merrill Lynch in any office and in any capacity. My agreement 'not to solicit' means that I will not, during my employment and for a period of one year thereafter, initiate any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting any Account:

(a) to transfer from Merrill Lynch to me or to my new employer, or

(b) to open a new account with me or with my new employer, or

(c) to otherwise discontinue its patronage and business relationship with Merrill Lynch.

(Pl.'s Ex. 1.)

The *Financial Consultant Employment Agreement and Restrictive Covenants* executed by Napolitano further provides:

4. In the event I breach any of the covenants of paragraphs 1, 2 or 3, I agree that Merrill Lynch will be entitled to injunctive relief. I recognize that Merrill Lynch will suffer immediate and

irreparable harm and that money damages will not be adequate to compensate Merrill Lynch or to protect and preserve the status quo. Therefore, I CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER or A PRELIMINARY or PERMANENT INJUNCTION ordering:

(a) that I immediately return to Merrill Lynch all records whether original, duplicated, computerized, handwritten, or in any other form whatsoever, and that I be enjoined and restrained from using or disclosing any information contained in such records; and

(b) that, for a period of one year, I be enjoined and restrained from soliciting any Account whom I served or whose name became known to me while employed by Merrill Lynch, in any office and in any capacity; and

(c) that I be further enjoined and restrained, for a period of one year, from accepting business from any Account who was solicited in violation of paragraph 2 or whose records and information was used in violation of paragraph 1.

The above restraints shall apply to each and every Account whom I served or whose name became known to me while employed at Merrill Lynch .... During my employment, some of the accounts I expect to develop or acquire are likely to be those individuals I knew or was familiar with prior to joining Merrill Lynch ("Prior Acquaintances"). Nevertheless, because I will be acting as a representative of Merrill Lynch and I will be utilizing and benefiting from Merrill Lynch's goodwill, reputation, name recognition, and other assets and resources, I further agree that the Accounts of such Prior Acquaintances will be subject to the same restraints as the other Accounts. The only exception will be my family and relatives.

(Pl.'s Ex. 1.)

Napolitano also agreed in writing to comply with Merrill Lynch's *Compliance Outline for Private Client Financial Consultants, Conflict of Interest Agreement* and *Guidelines for Business Conduct,* each of which contains statements confirming the confidentiality of Merrill Lynch customer information and prohibiting its disclosure to third parties. (Pl.'s Exs. 2–4.)

As a Merrill Lynch financial consultant, Napolitano serviced approximately 150 Merrill Lynch households representing more than $30 million in assets under Merrill Lynch management, which generated more than $420,000 in gross commission revenues for Merrill Lynch in 1999. (January 27, 2000 Hr'g Tr. at 14, 80, 85.)

Napolitano resigned from Merrill Lynch's Elkins Park, Pennsylvania office, without prior notice, at the close of business on Friday, January 7, 2000 and immediately joined Morgan Stanley Dean Witter Inc. ("Dean Witter"), a competitor of Merrill Lynch located in Jenkintown, Pennsylvania. (January 27, 2000 Hr'g Tr. at 13–14.)

Before his resignation, Napolitano surreptitiously met with the branch manager of Dean Witter's Jenkintown office, Joseph E. Links ("Links"). (January 27, 2000 Hr'g Tr. at 36.) During this meeting, the men recognized the possibility that Merrill Lynch would bring a lawsuit seeking immediate enforcement its non-solicitation agreement. (January 27, 2000 Hr'g Tr. at 36.) In a brazen effort to prevent Merrill Lynch from obtaining a temporary restraining order until the following Monday, Links, who knew that Napolitano had entered into a non-solicitation agreement with Merrill Lynch, (January 27, 2000 Hr'g Tr. at 39), directed Napolitano not to resign from Merrill Lynch until after the market had closed on Friday, (January 27, 2000 Hr'g Tr. at 37, Pl.'s Ex. 11). Links further directed Napolitano not to participate in an exit interview at Merrill Lynch because it would disclose information that could be used against him in court. (January 27, 2000 Hr'g Tr. at 37.) Finally, Links told Napolitano to "work hard over

the weekend and touch base with as many people as he could" because at some point Merrill Lynch would seek a court order preventing him from communicating with its clients. (January 27, 2000 Hr'g Tr. at 37, 41.)[2]

Before his resignation, Napolitano removed or retained information pertaining to the customers he serviced at Merrill Lynch, including their names, addresses, and telephone numbers. (January 27, 2000 Hr'g Tr. at 27, 30.) Napolitano stored this information within an electronic address book and the memory of a cellular telephone. (January 27, 2000 Hr'g Tr. at 27, Pl.'s Exs. 8, 10.) Napolitano removed the Merrill Lynch customer information without Merrill Lynch's knowledge or permission. (*See* Vincent A. Crimaldi Aff.)

Totally disregarding his clear obligations under the *Financial Consultant Employment Agreement and Restrictive Covenants,* Napolitano used this customer information to telephone approximately 100 households that had accounts with Merrill Lynch. (January 27, 2000 Hr'g Tr. at 18, 86.) He began this series of telephone calls on Friday afternoon, immediately after his resignation from Merrill Lynch. (January 27, 2000 Hr'g Tr. at 25, 48, 57.) During the conversations, Napolitano informed Merrill Lynch clients that he had "good news on two fronts": first, he had become engaged on Christmas Eve; and second, he had accepted a vice-presidency at Dean Witter. (January 27, 2000 Hr'g Tr. at 19.) Napolitano further stated: "I will no longer be at Merrill Lynch handling [your] accounts and, although I am not permitted to solicit [your] business, [you] are still free to do what [you] want with [your] accounts." (January 27, 2000 Hr'g Tr. at 19–20.) In some cases, Napolitano also informed the client that his con-

duct might cause Merrill Lynch to ask the Court for a temporary restraining order. (January 27, 2000 Hr'g Tr. at 20.) Napolitano testified: "It was my hope that [these clients] would communicate their desire to transfer" their accounts from Merrill Lynch to Dean Witter. (January 27, 2000 Hr'g Tr. at 19.) And there can be no doubt that he immediately invited them to do so.

When the clients expressed interest in transferring their accounts to Dean Witter, Napolitano told them that he would send the appropriate forms to them. (January 27, 2000 Hr'g Tr. at 20.) Several Dean Witter employees worked throughout the weekend preparing and sending the transfer forms to these clients via Airborne Express. (January 27, 2000 Hr'g Tr. at 22.) Napolitano provided these Dean Witter employees with the Merrill Lynch clients' names, addresses, and telephone numbers to enable them to prepare the Airborne Express labels. (January 27, 2000 Hr'g Tr. at 24, 26, 72.) Napolitano also met with some Merrill Lynch clients in person and presented them with account transfer forms. (January 27, 2000 Hr'g Tr. at 24.)

On Saturday, January 8, 2000, at 2:52 a.m., Napolitano sent an e-mail to Peter David, a Dean Witter sales manager in Jenkintown. (January 27, 2000 Hr'g Tr. at 29; Pl.'s Ex. 9.) The e-mail contained a preliminary list of the names, addresses, and telephone numbers of clients that Napolitano had served at Merrill Lynch. (January 27, 2000 Hr'g Tr. at 29–30.) Napolitano continued to telephone Merrill Lynch clients until approximately 9:30 p.m. on January 11, 2000, when he learned that the TRO had taken effect upon the posting of a bond earlier in the day. (January 27, 2000 Hr'g Tr. at 31.)[3] He testified that

---

**2.** The administrative manager of Merrill Lynch's Elkins Park office sent a copy of Napolitano's employment agreement to Napolitano's new employer on Monday, January 10, 2000. (Vincent A. Crimaldi Aff. at ¶ 8.)

**3.** After the January 11, 2000 hearing had concluded, Napolitano's attorney notified him that the Court had issued a TRO that would take effect upon the posting of bond and that "Merrill Lynch's counsel had said during the courtroom that they didn't think they could

"[i]t was because of the restraining order that [he] didn't contact the rest." (January 27, 2000 Hr'g Tr. at 25.) Napolitano also testified, however, that by 9:30 on January 11, 2000, he had succeeded in making all of the telephone calls that he had wanted to make. (January 27, 2000 Hr'g Tr. at 84.) He stated: "The others, for one reason or another, I felt could be put on the back burner. It might have involved my having—those are the people that would—that would—would require some sort of persuading these people." (January 27, 2000 Hr'g Tr. at 84.)

As a vice president at Dean Witter, Napolitano will receive a guaranteed salary of $15,000 per month for four months, and $2,500 per month thereafter. (Pl.'s Ex. 5.) In addition, "for assets brought into Dean Witter within the first thirteen (13) months of [his] employment," he will receive: "(1) $6,000 for every $1 million in assets up to and including $30 million in assets; and (2) $4,000 for every $1 million in assets in excess of $30 million in assets up to and including $40 million in assets." (Pl.'s Ex. 5.)[4]

## B. LAW

Four factors govern a district court's decision whether to issue a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

get it posted that day, but they would try." (January 27, 2000 Hr'g Tr. at 32.) Merrill Lynch posted a bond at 4:00 p.m., and notified Napolitano's attorney shortly thereafter by sending him a letter. (January 27, 2000 Hr'g Tr. at 32.) Napolitano's attorney received the letter upon returning to his office that evening, sometime between 9:00 p.m. and 9:30 p.m., and immediately telephoned Napolitano. (January 27, 2000 Hr'g Tr. at 32.) Napolitano testified that at "[a]pproximately 9:00, 9:30 I—I learned that, in fact, contrary to what the Merrill Lynch attorneys

*Doe v. National Bd. of Medical Examiners,* 199 F.3d 146, 153–54 (3d Cir.1999) (quoting *American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ.,* 84 F.3d 1471, 1477 n. 2 (3d Cir.1996) (en banc)).

### 1. Whether the Movant Has Shown a Reasonable Probability of Success on the Merits

■ Napolitano disengenuously argues that he "did not solicit clients of Merrill Lynch, but merely announced his move to [Morgan Stanley] Dean Witter." (Def.'s Br. at 7, docket # 5.) The fact is, however, that Napolitano did more than merely announce his departure from Merrill Lynch; he informed Merrill Lynch clients that he was moving to Dean Witter and that they were "free to do what they want with their accounts." (January 27, 2000 Hr'g Tr. at 19–20.) In the employment agreement, Napolitano expressly agreed that he would not "initiate any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting any Account. . . ." (Pl.'s Ex. 1.) He further agreed that he would not solicit either directly or indirectly. (Pl.'s Ex. 1.) Based on the present record, the Court finds that Merrill Lynch is likely to succeed in showing that Napolitano intentionally engaged in the very conduct that the employment agreement so clearly and unambiguously prohibits.

Napolitano also argues that the *Financial Consultant Employment Agreement and Restrictive Covenants* does not apply to information about clients whom he knew

thought, they managed to get a bond near the close of the business day. And that I must cease and desist." (January 27, 2000 Hr'g Tr. at 33.)

4. As previously stated, at the time that Napolitano resigned from Merrill Lynch, he serviced approximately 150 Merrill Lynch households representing more than $30 million in assets under Merrill Lynch management. (January 27, 2000 Hr'g Tr. at 14, 80, 85.)

before he began his employment with Merrill Lynch. (January 27, 2000 Hr'g Tr. at 25, 26, 100.) Again, however, Napolitano explicitly agreed that because he would "be acting as a representative of Merrill Lynch" and would be "utilizing and benefiting from Merrill Lynch's goodwill, reputation, name recognition, and other assets and resources," the information pertaining to such clients would be subject to the *Financial Consultant Employment Agreement and Restrictive Covenants.* (Pl.'s Ex. 1.)

Similarly, Napolitano argues that the names, addresses, and telephone numbers of Merrill Lynch clients are not confidential trade secrets and that he therefore was permitted to use this information after his departure from the company. (Def.'s Br. at 9–10, docket # 5.) In the employment agreement, however, Napolitano expressly agreed that the "names, addresses, phone numbers, and financial information of any account, customer, client, customer lead or prospect ("Account"), are confidential and are the sole and exclusive property of Merrill Lynch ... and are deserving of trade secret status and protection." (Pl.'s Ex. 1.) Based on the present record, therefore, the Court finds that Merrill Lynch is likely to succeed in showing that Napolitano wrongfully removed names, addresses, and telephone numbers from the Merrill Lynch office and then disclosed this information to employees of Dean Witter. In short, Merrill Lynch has shown far more than a reasonable probability of success on the merits.

### 2. *Whether the Movant Will Be Irreparably Injured by Denial of the Relief*

■ Because Napolitano took information pertaining to Merrill Lynch's clients and used that information to solicit those clients, the harm to Merrill Lynch is irreparable and a legal remedy is inadequate.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano,* 999 F.2d 211, 215 (7th Cir.1993) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley,* 756 F.2d 1048, 1055 (4th Cir.1985) ("Merrill Lynch faced irreparable, noncompensable harm in the loss of its customers")); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Stidham,* 658 F.2d 1098, 1102 n. 8 (5th Cir.1981); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rodger,* 75 F.Supp.2d 375, 381–82 (M.D.Pa.1999); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rahn,* 73 F.Supp.2d 425, 428–29 (S.D.N.Y.1999); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ran,* 67 F.Supp.2d 764, 779 (E.D.Mich.1999); *Merrill Lynch, Pierce, Fenner & Smith v. Schwartz,* 991 F.Supp. 1480, 1482 (M.D.Ga.1998); *Wells v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 919 F.Supp. 1047, 1051–52 (E.D.Ky.1994); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Grall,* 836 F.Supp. 428, 433–34 (W.D.Mich.1993).[5]

### 3. *Whether Granting Preliminary Relief Will Result in Even Greater Harm in the Nonmoving Party*

This third factor requires the Court to balance the harm to Merrill Lynch if the injunction were not issued against the harm to Napolitano if it were issued improvidently. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rodger,* 75 F.Supp.2d 375, 382 (M.D.Pa.1999) (citing *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d Cir.1998)). Napolitano's argument that the imposition of a preliminary injunction would unfairly impose restrictions on his right to earn a living, (Def.'s Br. at 11, docket # 5), ignores the undeniable fact that an injunction would not prevent Napolitano from engaging in the brokerage business. Rather, an injunction merely would prohibit him from soliciting certain Merrill Lynch clients and from accepting business

---

**5.** *But see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop,* 839 F.Supp. 68, 72–74 (D.Me.1993); *Merrill Lynch Pierce, Fenner &* *Smith v. Bennert,* 980 F.Supp. 73, 75 (D.Me. 1997).

from any client that he has wrongfully solicited until the arbitrators decide the issue of permanent injunctive relief, which is expected to occur within a few weeks. Significantly, any harm to Napolitano would be self-inflicted; he anticipated that Merrill Lynch immediately would seek to enforce its unambiguous employment contract, and chose to breach it nevertheless. The self-inflicted nature of any harm suffered by the wrongdoer (Napolitano) weighs heavily in favor of granting preliminary injunctive relief. *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 806 (3d Cir.1998), *cited in Rodger,* 75 F.Supp.2d at 382; *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Ran,* 67 F.Supp.2d 764, 780 (E.D.Mich.1999) ("In considering the hardships to all involved, however, those suffered by defendants are the least deserving of the court's consideration as their travails were needlessly self-imposed, unlike the burdens on customers and Merrill Lynch, which were not chosen, but rather were inflicted by defendants' contractual breaches.").

### 4. Whether Granting the Preliminary Relief Will Be in the Public Interest.

Merrill Lynch persuasively argues that an injunction would serve the public interest by enforcing valid contractual provisions. Napolitano self-servingly argues that a denial of an injunction would serve the public interest by preserving "the unqualified right of the investing public to make decisions on their choice of investment advisors." (Def.'s Br. at 12, docket # 5.)

As Napolitano correctly observes, an injunction might force clients who had thought that their investments were secure through Napolitano to find a new financial advisor with whom they feel equally comfortable.[6] It bears mention, however, that

> [t]he brokerclient relationship ... is a two-way street. It is not merely the client's choice of broker which must be preserved, but the broker has a say in who his clients will be as well. In this case, the broker[ ] agreed that [he] would not do business with any clients [that he] solicited in violation of [his] contract[ ].

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Ran,* 67 F.Supp.2d 764, 780 (E.D.Mich.1999). By wrongfully soliciting Merrill Lynch clients, Napolitano himself is to blame for severing the broker-client relationships at issue in this case. *See Ran,* 67 F.Supp.2d at 780.

■ Regardless of who is to blame, the impact of Napolitano's behavior on innocent clients poses the most difficult aspect of this case.

Two considerations are significant here. First, as noted, securities customers often develop a trusting relationship with their brokers and the clients consider this relationship irreplaceable. Second, the rules of the NYSE and NASD provide that a customer can direct a brokerage to transfer his or her account to another institution.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rodger,* 75 F.Supp.2d 375, 383 (M.D.Pa.1999). These considerations notwithstanding, the Court concludes that the harm to the Merrill Lynch clients who were allegedly solicited by Napolitano does not outweigh the other relevant and more compelling considerations.

> First, our injunction is only temporary and will last only until the arbitrators finally decide the issue of permanent injunctive relief. *See Ran, supra,* 67

---

6. The Court notes that upon learning of Napolitano's departure, Merrill Lynch immediately reassigned the customer accounts that had been serviced by Napolitano to other financial consultants. (*See* Vincent A. Crimaldi Aff. at ¶ 9.) Those financial consultants began telephoning the owners of these accounts on Monday, January 10, 2000 to inform them of the reassignment. (*See* Vincent A. Crimaldi Aff. at ¶ 9.) At the preliminary injunction hearing, only two clients expressed dissatisfaction with the reassignment. (January 27, 2000 Hr'g Tr. at 44–61.)

F.Supp.2d at 780. Second, our decision does not mean that the customers' assets are frozen. They can still consult with Merrill Lynch or another brokerage besides Prudential as to what transactions to make in their accounts to meet market conditions. Third, refusing to vacate the current order serves the overall purpose of a preliminary injunction by maintaining the status quo. *Favia v. Indiana University of Pennsylvania*, 7 F.3d 332, 342 (3d Cir.1993). In turn, maintaining the status quo will allow the arbitration panel to provide orderly relief. *See Ran, supra*, 67 F.Supp.2d at 780 (noting that it would not make sense to allow transfers that may be rescinded by an arbitral ruling and that the status quo should prevail). *Rodger*, 75 F.Supp.2d at 383 (citing *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Masri*, No. CIV. A. 96–CV–3804, 1996 WL 283644, at *5 (E.D.Pa. May 28, 1996) (Merrill Lynch's interest in its business investments and confidential customer information outweighed the "consumers' interest in dealing with a financial consultant of their choice"); *Orbach v. Merrill Lynch Pierce, Fenner & Smith, Inc.*, No. 93–CV–75349–DT, 1994 WL 900431, at *7 (E.D.Mich. Jan.11, 1994) (the temporary harm to former clients from not being able to consult with their brokers is outweighed by other factors counseling in favor of injunctive relief)).

Moreover, as Merrill Lynch has pointed out, the affected clients' interest in having Napolitano maintain their accounts is not the only public interest involved in this case; the Court also must consider the even more compelling public interest in the enforcement of contracts.

Unless the court enforces the terms of the contracts entered into by the sophisticated parties and entitles in this case, the court will be undermining the legitimate business expectations not only of the parties here, but of all contracting parties. It is the knowledge that valid and enforceable contractual agreements will be enforced in courts of competent jurisdiction which allows our competitive marketplace to thrive. Without such a rule of law, parties could not rely on contracts to conduct their affairs.

*Ran*, 67 F.Supp.2d at 781. By signing the *Financial Consultant Employment Agreement and Restrictive Covenants*, Napolitano expressly agreed that he would not solicit Merrill Lynch clients for a period of one year after his departure. Although he lamely asserts that his communications with clients in the immediate aftermath of his resignation from Merrill Lynch did not amount to wrongful "solicitation," the Court finds that the arbitrators probably will conclude that his conduct invited or encouraged these clients to follow him to Dean Witter. Likewise, the Court finds that the arbitrators probably will conclude that the disclosure of names, addresses, and telephone numbers of Merrill Lynch clients to employees of Dean Witter also constituted a breach of contract.

The issuance of this preliminary injunction thus will serve the compelling public interests of enforcing valid contractual provisions and protecting business investments and confidential customer information.

## CONCLUSION

Merrill Lynch has established that it has, at the very least, a reasonable probability of success on the merits and that it will be irreparably injured if preliminary relief is not granted. In addition, the harm to Merrill Lynch from the denial of preliminary relief greatly outweighs the inconvenience to Napolitano of its issuance, and the public interest will be best served by a preliminary injunction. An Order follows.

### ORDER

**AND NOW**, this 2nd day of February 2000, for the reasons stated in the accompanying Memorandum, it is **ORDERED** that the motion of Merrill Lynch, Pierce, Fenner, & Smith, Inc. ("Merrill Lynch")

for a preliminary injunction is **GRANTED** as follows:

1. A preliminary injunction order shall issue immediately and the security previously posted by Merrill Lynch in support of the Court's Temporary Restraining Order, dated January 11, 2000, shall remain in full force and effect;

2. Defendant, Todd E. Napolitano, is enjoined and restrained, directly and indirectly, and whether alone or in concert with others, including any officer, agent, representative, and/or employee of his new employer Morgan Stanley Dean Witter, Inc. from:

a) soliciting any business from any client of Merrill Lynch whom Defendant served or whose name became known to Defendant while in the employ of Merrill Lynch and, further, from accepting any business or account transfers from any said customers whom Defendant has solicited at any time in the past for the purpose of doing business with Defendant's new employer, Morgan Stanley Dean Witter, Inc. (excluding members of Defendant's family and relatives); and

b) using, disclosing or transmitting for any purpose, including solicitation of said clients, the information contained in the records of Merrill Lynch, including, but not limited to, the names, addresses, telephone numbers, and financial information of said clients;,

3. To the extent not already done so pursuant to the Court's Order of january 11, 2000, Defendant, and anyone acting in active concert or participation with Defendant who receives actual notice of this Order, including any agent, employee, officer or representative of Defendant's present employer, Morgan Stanley Dean Witter, Inc., are further ordered to return to Merrill Lynch's Elkins Park, Pennsylvania office and all information pertaining to Merrill Lynch clients whether in original, copied, computerized, handwritten or any other form, and to purge such information from their possession, custody or control, within twenty-four (24) hours of service of this Order upon Defendant of his legal counsel.

4. This Order shall remain in effect in full force until a final decision is rendered by a three-member panel of arbitrators duly appointed in accordance with the Code of Arbitration procedure of the national Association of Securities Dealers.

5. The parties are directed to proceed with the expedited arbitration proceeding commenced by Merrill Lynch before a duly appointed panel of arbitrators in accordance with Section 10335(g) of the NASD Code of Arbitration procedure.

6. The injunction shall not apply to any client solicitation or account transfers that may be agreed upon in writing by the parties and their respective counsel. The injunction will be dissolved when a decision by the NASD arbitration panel becomes final, or by further order of this court.

7. Upon receiving any account transfer form from any client who received an account transfer sent by Defendant or Morgan Stanley Dean Witter, Inc. on January 8, 9, 10 or 11, 2000 (*see* Pl.'s Ex. 7, 9), Morgan Stanley Dean Witter, Inc. is directed to send such client a letter that states the following:

Dear[CLIENT NAME]:

In connection with a contract dispute between Todd E. Napolitano and Merrill Lynch, Pierce, Fenner & Smith, Inc., a court has temporarily enjoined Morgan Stanley Dean Witter from conducting business with you. As a result, we are unable to process an account transfer at this time. We hope that this matter will be resolved in the near future.

Very Truly Yours,

Morgan Stanley Dean Witter, Inc. shall enclose a copy of this Memorandum & Order with the letter. The letter and copy of this Memorandum & Order shall be sent without additional enclosures or information. Defendant shall notify Merrill Lynch of the name and address of all recipients of this letter.

8. Counsel are directed to advise the Court in writing on or before February 25, 2000 as to the status of the arbitration.