**MERRILL LYNCH, PIERCE, FENNER & SMITH INC., Plaintiff,**

v.

**Mark W. CHAMBERLAIN, Defendant.**

**No. 4:01–CV–992.**

United States District Court, M.D. Pennsylvania.

June 8, 2001.

Paul Kirk, Joseph A. Dougherty, Rubin & Associates, Paoli, PA, James A. Gibbons, Gibbons Law Firm, Scranton, PA, for plaintiff.

Howard Kellen, Lancaster, PA, for defendant.

## OPINION

MUIR, District Judge.

### I. Introduction.

On June 5, 2001, Plaintiff Merrill Lynch, Pierce, Fenner & Smith, Inc. (hereinafter "Merrill Lynch"), filed a five-count complaint against Defendant Mark W. Chamberlain for injunctive relief (Count I), breach of contract (Count II), conversion of trade secrets (Count III), breach of fiduciary duty (Count IV) and unfair competition (Count V). Also on June 5, 2001, Merrill Lynch filed a motion for a temporary restraining order and preliminary injunction. A hearing with respect to the request for preliminary injunctive relief was held on June 7, 2001.[1] The following are the Court's findings of fact, discussion, and conclusions of law with regard to Merrill Lynch's request for a preliminary injunction.

### II. Findings of Fact.

1. Merrill Lynch is a Delaware corporation maintaining its principal place of business at the World Financial Center, North Tower, New York, New York and transacting business in this judicial district at 600 Baltimore Drive, Wilkes–Barre, Pennsylvania. (Undisputed, hereinafter "U")

2. Merrill Lynch is engaged in the business of, *inter alia*, providing financial services. (U)

3. Chamberlain is a citizen of the Commonwealth of Pennsylvania residing at 28 2nd Avenue, Kingston, Pennsylvania 18704.(U)

4. Chamberlain commenced his employment with Merrill Lynch in the Company's Wilkes–Barre Office as a financial advisor in July, 1995.(U)

5. Prior to his employment with Merrill Lynch, Chamberlain had worked for over 15 years in the Trust Departments of various institutions.

6. Chamberlain's business contacts through his prior employment resulted in some new clients for Merrill Lynch.

7. Prior to employment at Merrill Lynch, Chamberlain had no experience in the securities industry, held no securities industry licenses, and had never serviced any customers in the securities industry. (U)

8. As a Merrill Lynch financial consultant, Chamberlain serviced hundreds of Merrill Lynch households representing over $23 million in assets under Merrill Lynch management. These accounts generated in excess of $170,000 in gross commission revenues for Merrill Lynch in 2000 alone. (U)

---

**1.** At the hearing counsel for both parties agreed that the hearing should be considered as one held on Merrill Lynch's request for a preliminary injunction.

9. Chamberlain resigned from Merrill Lynch's Wilkes–Barre, Pennsylvania office, without prior notice, at the close of business on Friday, June 1, 2001 and immediately joined a competitor of Merrill Lynch, Morgan Stanley Dean Witter Inc. ("Morgan Stanley"), located nearby. (U)

10. Prior to his resignation, Chamberlain removed and retained information pertaining to the customers he serviced at Merrill Lynch, including customers' names, addresses, and telephone numbers. (U)

11. The Merrill Lynch customer information that Chamberlain removed included customer information contained on a laptop computer as well as client account statements which contained the names, addresses, types of accounts and account numbers of clients Chamberlain serviced while employed at Merrill Lynch.

12. Chamberlain removed and retained the Merrill Lynch customer information from Merrill Lynch without Merrill Lynch's knowledge and permission. (U)

13. Chamberlain provided Merrill Lynch customer information to Morgan Stanley.

14. Morgan Stanley has used the customer information provided by Chamberlain to prepare mailings addressed to Merrill Lynch customers that Chamberlain serviced while employed at Merrill Lynch.

15. Chamberlain also used the customer information for the purpose of otherwise advising Merrill Lynch customers that they have the ability to transfer their Merrill Lynch accounts and business to Morgan Stanley. Chamberlain did so by contacting Merrill Lynch customers by telephone over the weekend of June 1–3, 2001.(U)

16. The targeted telephone contacts to Merrill Lynch customers were allegedly placed for the sole purpose of "informing" or "announcing" customers of Chamberlain's change of employment but, in fact, included and evolved into discussions regarding Morgan Stanley and the transfer of customer accounts and business to Morgan Stanley. (U)

17. During these conversations, Chamberlain told customers he could not "solicit" their business, he also told the customers that they were "free to do with their accounts what they wished." At the conclusion of many of these telephone calls, Chamberlain and Morgan Stanley thereafter dispatched account transfer forms to Merrill Lynch customers. (U)

18. In addition, Chamberlain met with Merrill Lynch customers in person following his resignation to present them with account transfer forms. (U)

19. Chamberlain provided customer information to Morgan Stanley so it could prepare packages that included the account transfer forms to be sent to Merrill Lynch customers. These packages were then dispatched by Morgan Stanley to Merrill Lynch customers following Chamberlain's telephone contacts. (U)

20. During at least one of the telephone conversations between Chamberlain and Merrill Lynch customers, Chamberlain stated that "Merrill Lynch is only interested in new trust accounts exceeding $1,000,000."

21. Chamberlain contacted at least one Merrill Lynch customer prior to his June 1, 2001 resignation to inform the customer of his intent to resign from Merrill Lynch and to discuss the possibility of doing business with the customer at Morgan Stanley. (U)

22. In exchange for his decision to leave Merrill Lynch and join Morgan Stanley, Chamberlain was guaranteed by Mor-

gan Stanley a salary of $50,000.00 plus commissions.

23. In the year 2000, Chamberlain's income from his employment with Merrill Lynch was less than $50,000.00.

24. As a condition of his employment with Merrill Lynch, Chamberlain was required to execute an employment agreement known as a *Financial Consultant Employment Agreement and Restrictive Covenants* ("Agreement") which provides in part:

1. *All records*, whether original, duplicated, computerized, memorized, handwritten, or in any other form, *and all information,* contained therein, including names, addresses, phone numbers, and financial information of any account, customer, client, customer lead or prospect ("Account"), are confidential and are the sole and exclusive property of Merrill Lynch. This information, whether provided to me by Merrill Lynch or by any Account, is entrusted to me as an employee and sales representative of Merrill Lynch. I will not use this information or remove any such records from the Merrill Lynch office except for the sole purpose of conducting business on behalf of Merrill Lynch. I agree not to divulge or disclose this information to any third party and under no circumstances will I reveal or permit this information to become known by any competitor of Merrill Lynch either during my employment or at any time thereafter.

This information is extremely valuable to Merrill Lynch and Merrill Lynch takes all reasonable measures to maintain its confidentiality and to guard its secrecy. This information is not generally known outside Merrill Lynch and within Merrill Lynch this information is confidential and used only on a "need to know" basis. This information is developed and acquired by great expenditures of time, effort and money. This information is unique and cannot be lawfully duplicated or easily acquired. Consequently, I agree that these records and the information contained therein are the property of Merrill Lynch and are deserving of trade secret status and protection.

2. If, at any time, I resign from Merrill Lynch, provoke my termination, or am terminated for cause, I agree that for a period of one year following my termination I will not solicit by mail, by phone, by personal meeting, or by any other means, either directly or indirectly, any Account whom I served or whose name became known to me during my employment at Merrill Lynch in any office and in any capacity. My agreement "not to solicit" means that I will not, during my employment and for a period of one year thereafter, initiate any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting any Account:

(a) to transfer from Merrill Lynch to me or to my new employer, or

(b) to open a new account with me or with my new employer, or

(c) to otherwise discontinue its patronage and business relationship with Merrill Lynch.

(U)

25. The *Financial Consultant Employment Agreement and Restrictive Covenants* executed by Chamberlain also contains an express consent to the entry of a preliminary injunction by this Court to preserve the status quo pending arbitration on the merits in the event Chamberlain breached any of the terms of his employment agreement. (U)

26. Chamberlain also agreed in writing to comply with Merrill Lynch's *Compliance Outline for Private Client Financial Consultant's, Conflict of Interest Agreement* and *Guidelines for Business Conduct*, each of which contain statements confirming the confidentiality of Merrill Lynch customer information and prohibiting its disclosure to third parties. (U)

27. Chamberlain failed to abide by the terms of the *Financial Consultant Employment Agreement and Restrictive Covenants.*

### III. Discussion.

■ Preliminary injunctive relief is extraordinary in nature, and is discretionary with the trial judge. *Frank's GMC Truck Center, Inc. vs. General Motors Corp.*, 847 F.2d 100, 101–102 (3d Cir.1988); *Glasco vs. Hills*, 558 F.2d 179, 179 (3d Cir.1977); *Orson, Inc. vs. Miramax Film Corp.*, 836 F.Supp. 309, 311 (E.D.Pa.1993). This discretion is necessary because of the "infinite variety of situations which may confront" the trial judge. *A.L.K. Corp. vs. Columbia Pictures Indus., Inc.*, 440 F.2d 761, 763 (3d Cir.1971). In considering a motion for preliminary injunctive relief, the court must consider, when appropriate, the following four factors: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the plaintiff will be irreparably injured by denial of such relief; (3) whether granting preliminary relief will result in even greater harm to the non-moving party; and (4) whether granting preliminary relief will be in the public interest. *ECRI vs. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987); *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1254 (3d Cir.1985). Where a movant fails to show either a reasonable probability of success on the merits or irreparable injury, preliminary relief must be denied. *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982).

■ A plaintiff need not establish with certainty that the plaintiff will succeed on the merits. The burden is on the moving party, however, to make a prima facie showing that the plaintiff has a reasonable probability of succeeding on the merits. *Oburn vs. Shapp*, 521 F.2d 142, 148 (3d Cir.1975).

■ The Court of Appeals for this circuit has held that "[i]n order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. vs. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir.1989). In light of the foregoing standard, we will now address the merits of Merrill Lynch's motion for a preliminary injunction.

■ First, under Pennsylvania law restrictive covenants such as those agreed to by Chamberlain are enforceable. See *John G. Bryant Company, Inc. v. Sling Testing & Repair, Inc.*, 471 Pa. 1, 369 A.2d 1164 (1977). The terms of Chamberlain's employment agreement along with the undisputed evidence that Chamberlain breached that agreement establish that there is clearly a reasonable probability that Merrill Lynch will succeed on the merits.

Second, it is well recognized that injunctive relief is necessary in cases involving violations or threatened violations of restrictive covenants such as are set forth in Chamberlain's employment agreement. See *Merrill Lynch vs. Bradley*, 756 F.2d 1048 (4th Cir.1985). In *Bradley*, a case virtually identical to the instant case, the Court of Appeals for the Fourth Circuit held that immediate injunctive relief is

necessary to avoid irreparable harm to Merrill Lynch and to maintain the status quo. The Court of Appeals stated:

> When an account executive breaches his employment contract by soliciting his former employer's customers, a nonsolicitation clause requires immediate application to have any effect. An injunction even a few days after solicitation has begun is unsatisfactory because the damage is done. The customers cannot be "unsolicited."

756 F.2d at 1054; see also *Merrill Lynch vs. Stidham*, 658 F.2d 1098 (5th Cir.1981) (breach of employment agreement and misappropriation of trade secrets caused irreparable harm). Merrill Lynch will suffer irreparable harm in the absence of immediate injunctive relief.

The third factor requires us to balance the irreparable harm to Merrill Lynch against the harm to Chamberlain if an injunction is granted. In the year 2000 Chamberlain earned less than $50,000.00. At the present time Chamberlain is guaranteed a salary of $50,000.00 by Morgan Stanley. Also, Chamberlain's employment agreement with Morgan Stanley entitles him to commissions. The issuance of an injunction in this case will not harm Chamberlain but only maintain the status quo. Furthermore, the parties agree that the final merits of this dispute will be resolved in arbitration before the National Association of Securities Dealers. That arbitration is expected to take place within a few weeks. Consequently, any injunction we issue will only be in effect for a relatively short time.

The fourth and final factor we must consider is whether granting preliminary relief will be in the public interest. We are satisfied that the issuance of an injunction would benefit the public because it would promote the enforcement of reasonable contracts. Moreover, an injunction would protect Merrill Lynch's highly sought after client list and the confidentiality of those clients' records and discourage Merrill Lynch's competitors from inducing Merrill Lynch's employees to breach their contracts and convert Merrill Lynch trade secrets. See, e.g., *Merrill Lynch v. Napolitano*, 85 F.Supp.2d 491 (E.D.Pa.2000) ("Merrill Lynch persuasively argues that an injunction would serve the public interest by enforcing valid contractual provisions.") (Newcomer, J.); *Merrill Lynch vs. Masri*, 1996 WL 283644 at *5 (E.D.Pa. 1996) ("Issuing a preliminary injunction serves the public interest of enforcing valid contractual provisions and protecting business investments and confidential customer information.") (Kelly, J.).

Numerous federal and state courts have granted Merrill Lynch and other securities firms the identical injunctive relief requested in this case, including injunctions granted by the United States District Court for the Eastern, Middle and Western Districts of Pennsylvania. See, e.g., *Merrill Lynch vs. Rodger*, 75 F.Supp.2d 375 (M.D.Pa.1999) (Caldwell, J.). We will, likewise, grant Merrill Lynch's motion for injunctive relief.

### IV. Conclusions of Law.

1. Merrill Lynch has a reasonable probability of success on the merits.

2. Merrill Lynch will be irreparably injured in the event an injunction is denied.

3. Greater injury would be inflicted upon Merrill Lynch by the denial of the motion for a preliminary injunction than will be inflicted upon Chamberlain by granting such relief.

4. The issuance of a preliminary injunction is in the public interest.

An appropriate order will be entered.

## ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. Pursuant to the requirements of Sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. §§ 3 and 4, the parties are directed to proceed expeditiously with an arbitration in accordance with the procedures established by the National Association of Securities Dealers.

2. The motion of Merrill Lynch for a preliminary injunction filed on June 5, 2001, is granted.

3. Merrill Lynch shall post a bond in the amount of $5,000 within 3 working days of the date of this order. Failure by Merrill Lynch to post such bond in accordance with this paragraph will result in our vacation of this order.

4. Chamberlain is enjoined and restrained, directly or indirectly, and whether alone or in concert with others, including any officer, agent, representative, or employee of Chamberlain's new employer, Morgan Stanley, until completion of arbitration from:

4.1 soliciting any business from any account of Merrill Lynch whom Chamberlain served or whose name became known to Chamberlain while employed by Merrill Lynch in any office and in any capacity;

4.2 accepting business from any account who was solicited in violation of paragraph 2 of the *Financial Consultant Employment Agreement and Restrictive Covenants* ("Agreement") or whose records and information were used in violation of paragraph 1 of that Agreement;

4.3 using, disclosing, or transmitting for any purpose, including solicitation of said accounts, the information contained in the records of Merrill Lynch.

5. All original records and copies, computerized recordings or any and all other reproductions thereof, in whatever form, shall be returned by Chamberlain to Merrill Lynch's Wilkes–Barre, Pennsylvania, office within 2 working days of the issuance of this order.

6. This order shall remain in full force and effect until the completion of arbitration.

7. The Clerk of Court shall forthwith transmit a copy of this order by FAX to the offices of those counsel who may be so reached, shall read the dispositive provisions to other counsel over the telephone, and shall mail a copy to each counsel.

8. The Clerk of Court shall close this case.

9. The court retains jurisdiction of this case for the purpose of enforcing, modifying or rescinding, if necessary or advisable, any of the provisions of this order.